**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 07-3531
_____

PEDRO LOZANO; HUMBERTO
HERNANDEZ; ROSA LECHUGA;
JOHN DOE 1; JOHN DOE 2; JOHN
DOE 3, a Minor, By His parents;
JANE DOE 1; JANE DOE 2; JANE
DOE 3; JOHN DOE 4, a Minor, By
His parents, BRENDA LEE
MIELES; CASA DOMINICANA OF
HAZLETON, INC.; HAZLETON
HISPANIC BUSINESS
ASSOCIATION; PENNSYLVANIA
STATEWIDE LATINO
COALITION; JANE DOE 5; JOHN
DOE 7; JOSE LUIS LECHUGA,

v.

CITY OF HAZLETON,
*Appellant.*
_____

APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR
THE MIDDLE DISTRICT OF PENNSYLVANIA
(D.C. No. 3:06-cv-01586)
District Judge: Honorable James M. Munley
_____

Argued
August 15, 2012

On Remand from the United States Supreme Court
_____

Before: McKEE, *Chief Judge*, NYGAARD and VANASKIE,
*Circuit Judges*

(Opinion Filed: July 26, 2013)
_____

Omar Jadwat, Esq. (**ARGUED**)
Lee Gelernt, Esq.
American Civil Liberties Union
Immigrants' Rights Project
125 Broad Street, 18th Floor
New York, NY 10004

Lucas Guttentag, Esq.
Jennifer Chang, Esq.
American Civil Liberties Union Foundation
39 Drumm Street
San Francisco, CA 94111-0000

Witold J. Walczak, Esq.
American Civil Liberties Union
313 Atwood Street
Pittsburgh, PA 15213-0000

Jackson Chin, Esq.
Foster Maer, Esq.
Puerto Rican Legal Defense & Education Fund
99 Hudson Street, 14th Floor
New York, NY  10013-0000

Ghita Schwarz, Esq.
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, NY 10012-0000

Thomas B. Fiddler, Esq.
White & Williams
1650 Market Street
1800 One Liberty
Philadelphia, PA  19103

Elena Park, Esq.
Cozen O'Connor
200 Four Falls Corporate Center
P.O. Box 800, Suite 400
West Conshohocken, PA 19428-0800

Ilan Rosenberg, Esq.
Thomas G. Wilkinson, Esq.
Cozen O'Connor
1900 Market Street
Philadelphia, PA 19103

Shamaine A. Daniels, Esq.
P.O. Box 5347
Harrisburg, PA 17110

*Attorneys for Plaintiffs-Appellees*

Kris W. Kobach, Esq. (**ARGUED**)
University of Missouri-Kansas City
School of Law
5100 Rockhill Road, Law 1-200
Kansas City, MO 64110

Michael Hethmon, Esq.
Immigration Reform Law Institute
25 Massachusetts Avenue, N.W.
Suite 330B
Washington, D.C. 20001

*Attorneys for Defendant-Appellant*

Damon Scott
1446 Fair Oaks Lane
Florence, SC 29506

Paul J. Orfanedes, Esq.
James F. Peterson, Esq.
Judicial Watch, Inc.
501 School Street, S.W.
Washington, D.C. 20024-0000

Richard A. Samp, Esq.
Washington Legal Foundation
2009 Massachusetts Avenue, N.W.
Washington, D.C. 20036-0000

Andrew L. Schlafly, Esq.
939 Old Chester Road
Far Hills, NJ 07931

*Attorneys for Amicus Appellants*

Robin S. Conrad, Esq.
National Chambers Litigation Center
1615 H. Street, N.W., Suite 230
Washington, D.C. 20062-0000

Carter G. Phillips, Esq.
Sidley Austin
1501 K Street, N.W.
Washington, D.C. 20005

Eric A. Shumsky, Esq.
Orrick, Herrington & Sutcliffe
1152 15th Street, N.W.
Columbia Center
Washington, D.C. 20005-0000

Charles D. Weisselberg, Esq.
Berkley Law School
688 Simon Hall
Berkley, CA 94720

Jacob S. Pultman, Esq.
Allen & Overy
1221 Avenue of the Americas
New York, NY 10020-0000

John M. West, Esq.
Bredhoff & Kaiser
805 15th Street, N.W., Suite 1000

Washington, D.C. 20005-0000

Mark D. McPherson, Esq.
Morrison & Foerster
1290 Avenue of the Americas
New York, NY  10104

Burt M. Rublin, Esq.
Ballard Spahr
1735 Market Street, 51st Floor
Philadelphia, PA 19103

Nancy Winkelman, Esq.
Schnader Harrison Segal & Lewis
1600 Market Street, Suite 3600
Philadelphia, PA 19103

Kenneth J. Pfaehler, Esq.
Dentons US
1301 K Street, N.W.
Suite 600, East Tower
Washington, D.C. 20005-3364

Lawrence H. Fisher, Esq.
Cohen & Willwerth
301 Grant Street
One Oxford Centre, Suite 4300
Pittsburgh, PA 15219

*Attorneys for Amicus Appellees*

_____

OPINION OF THE COURT
_____

McKEE, *Chief Judge*.

This case is before us on remand from the United States Supreme Court.  The City of Hazleton previously appealed the District Court's judgment permanently enjoining enforcement of two Hazleton ordinances that attempt to

5

prohibit employment of unauthorized aliens and preclude them from renting housing within the City.[1]  In a precedential Opinion and Judgment filed on September 9, 2010, we upheld the permanent injunction.  Thereafter, the Supreme Court granted Hazleton's petition for a writ of certiorari and remanded this case so that we could reconsider our analysis in light of *Chamber of Commerce v. Whiting*, 563 U.S. __, 131 S. Ct. 1968 (2011).  *See City of Hazleton v. Lozano*, 563 U.S. __, 131 S. Ct. 2958 (2011).  Subsequently, the Court also decided *Arizona v. United States*, 567 U.S. __, 132 S. Ct. 2492 (2012).  Both *Whiting* and *Arizona* address the extent to which federal immigration law pre-empts various state laws pertaining to the treatment of unauthorized aliens.  On remand, we asked for supplemental briefing on whether either of those decisions alter our original analysis upholding the District Court's injunction.

Having thoroughly considered the additional submissions of the parties and the Court's decisions in *Whiting* and *Arizona*, we again conclude that both the employment and housing provisions of the Hazleton ordinances are pre-empted by federal immigration law. Accordingly, we will again affirm the District Court's order enjoining enforcement of these provisions.

## I.  BACKGROUND

The factual and procedural background underlying this case have been extensively described in the District Court's decision, *Lozano v. City of Hazleton*, 496 F. Supp. 2d 477 (M.D. Pa. 2007) ("*Lozano I*"), and our earlier decision, *Lozano v. City of Hazleton*, 620 F.3d 170 (3d Cir. 2010) ("*Lozano II*"), *vacated and remanded*, 131 S. Ct. 2958

---

[1] For reasons explained in *Lozano v. City of Hazleton*, 620 F.3d 170, 176 n.1 (3d Cir. 2010) ("*Lozano II*"), *vacated and remanded*, 563 U.S. __, 131 S. Ct. 2958 (2011), we will use the term "unauthorized alien" when discussing issues of employment, and we will use either "aliens not lawfully present" or "aliens lacking lawful immigration status" when referring to persons who are not legally in this country.

(2011). Accordingly, we need not reiterate that history as thoroughly as we otherwise would. However, context and clarity require that we first set forth those facts underlying our analysis on remand.

This litigation involves a series of immigration ordinances enacted by the City of Hazleton between July 2006 and March 2007. The two ordinances at issue are: (1) the Illegal Immigration Relief Act Ordinance ("IIRAO"), which consists of Ordinance 2006-18, as amended by Ordinance 2006-40, and Ordinance 2007-6; and (2) the Rental Registration Ordinance ("RO"), which consists of Ordinance 2006-13.[2] These ordinances attempt to regulate the employment of unauthorized aliens, and the provision of rental housing to aliens lacking lawful immigration status, within Hazleton.

The relevant employment provisions make it unlawful for any person "to knowingly recruit, hire for employment, or continue to employ, or to permit, dispatch, or instruct" any person without work authorization "to perform work in whole or in part within the City." IIRAO § 4A. The IIRAO also provides for public monitoring and prosecution, and sanctions violators by suspending their business permits. *Id.* § 4B. "Safe harbor" from the IIRAO's sanctions is available for businesses that verify work authorization using the federal E-Verify program. *Id.* § 4B(5).[3] The IIRAO also requires City

---

[2] The full text of the IIRAO and RO are set forth as an Appendix to *Lozano II*, 620 F.3d at 224-38. For convenience, we again attach the full text of these ordinances as an Appendix to this opinion.

[3] "E-Verify is an internet-based system that allows an employer to verify an employee's work-authorization status. An employer submits a request to the E-Verify system based on information that the employee provides. . . . In response to that request, the employer receives either a confirmation or a tentative nonconfirmation of the employee's authorization to work." *Chamber of Commerce v. Whiting*, 131 S. Ct. 1968, 1975 (2011) (internal quotation marks and citations omitted). For a more complete description of the E-Verify program,

agencies and certain businesses to enroll in the E-Verify program. *Id.* §§ 4B(6)(b), 4C, 4D.

The disputed housing provisions are found in both the IIRAO and the RO. The IIRAO makes legal immigration status a condition precedent to entering into a valid lease. *Id.* § 7B. The IIRAO also provides that it is "unlawful for any person or business entity that owns a dwelling unit in the City to harbor an illegal alien in the dwelling unit, knowing or in reckless disregard of the fact that an alien" is unauthorized. *Id.* § 5A. "Harboring" is broadly defined to include "let[ting], leas[ing], or rent[ing] a dwelling unit to an illegal alien." *Id.* § 5A(1).

The anti-harboring provisions in the IIRAO operate in conjunction with the rental registration scheme established in the RO. The RO requires that prospective occupants of rental housing over the age of eighteen obtain an occupancy permit. RO §§ 1m, 6a, 7b. The application for an occupancy permit requires submission of "[p]roper identification showing proof of legal citizenship and/or residency." *Id.* § 7b(1)(g). Landlords are prohibited from allowing anyone over the age of eighteen to rent or occupy a rental unit without an occupancy permit. *Id.* § 6a. Violators are subject to fines and possible imprisonment. RO § 10.

As explained in *Lozano II*, numerous plaintiffs sued alleging the ordinances were invalid and the District Court permanently enjoined enforcement of the ordinances after a two-week bench trial. The court concluded that the ordinances are pre-empted by federal law and contrary to the Due Process Clause of the Fourteenth Amendment, 42 U.S.C. § 1981, as well as a number of state laws limiting the authority of municipalities in Pennsylvania. *See Lozano II*, 620 F.3d at 181.[4]

---

including its evolution and history, see *Whiting*, 131 S. Ct. at 1986.

[4] The District Court dismissed Plaintiffs' Equal Protection, Fair Housing Act, privacy, and Pennsylvania

We thereafter affirmed the ultimate judgment of the District Court, although we differed in our reasoning.[5] In short, we held that the employment provisions in the IIRAO, though not expressly pre-empted, are conflict pre-empted because they stand as an obstacle to the accomplishment and execution of federal law. *Lozano II*, 620 F.3d 210-19. We also held that the housing provisions in the IIRAO and RO are invalid because they impermissibly "regulate immigration" and are both field and conflict pre-empted by federal immigration law. *Id.* at 219-24.[6]

As we noted at the outset, after we issued our decision in *Lozano II*, the Supreme Court granted the City's petition for a writ of certiorari, vacated our decision, and remanded for reconsideration in light of that Court's intervening decision in *Chamber of Commerce v. Whiting*, 131 S. Ct. 1968 (2011). In *Whiting*, the Supreme Court affirmed the decision of the Court of Appeals for the Ninth Circuit in *Chicanos Por La Causa, Inc. v. Napolitano*, 558 F.3d 856

---

Landlord and Tenant Act claims. Those portions of the District Court's ruling were not appealed.

[5] We first held that at least one Plaintiff had standing to challenge the employment and housing provisions of the Hazleton ordinances generally, but no Plaintiff had standing to challenge a severable private cause of action provision in the IIRAO. *Lozano II*, 620 F.3d at 184-94. We also held that certain Plaintiffs could proceed anonymously and that the confidentiality agreement between the parties did not violate 8 U.S.C. § 1373(a). *Id.* at 194-96. In addition, we concluded that Hazleton had waived any issues of severability except with respect to the private cause of action provision. *Id.* at 182. Hazleton did not seek review of these holdings in its petition for a writ of certiorari, and did not raise these issues in its supplemental briefing following remand. Accordingly, these portions of our earlier decision are not at issue here.

[6] Because we affirmed on pre-emption grounds, it was not necessary to reach the other grounds the District Court relied upon in imposing the injunction.

9

(9th Cir. 2009). There, the Court of Appeals for the Ninth Circuit had upheld the Legal Arizona Workers Act against claims of express and implied pre-emption. *Chicanos Por La Causa*, 558 F.3d at 866, 867. After the decision in *Whiting*, the Supreme Court decided *Arizona v. United States*, 132 S. Ct. 2492 (2012). There, the Court held that three of four challenged provisions of Arizona's immigration law, known as "S.B. 1070," were pre-empted. However, the Court overturned a preliminary injunction with respect to the fourth provision and remanded for additional fact finding.

## III. DISCUSSION[7]

The question before us on remand remains whether federal law pre-empts the employment and/or housing provisions of the Hazleton ordinances.

As we explained in *Lozano II*, "[t]he pre-emption doctrine is a necessary outgrowth of the Supremacy Clause," which "provides that the laws of the United States 'shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.'" *Lozano II*, 620 F.3d at 203 (quoting U.S. Const. art. VI, cl. 2). Pre-emption may be either express or implied, and implied pre-emption includes both field pre-emption and conflict pre-emption. *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992).

Field pre-emption occurs "[w]hen Congress intends federal law to 'occupy the field.'" *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000). "The intent to displace state law altogether can be inferred from a framework of regulation 'so pervasive . . . that Congress left no room for the States to supplement it' or where there is a

---

[7] The District Court had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367. We have jurisdiction pursuant to 28 U.S.C. § 1291. We review a district court's conclusions of law *de novo* and its factual findings for clear error. *See, e.g.*, *McCutcheon v. America's Servicing Co.*, 560 F.3d 143, 147 (3d Cir. 2009).

'federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'" *Arizona v. United States*, 131 S. Ct. 2492, 2501 (2012) (internal quotation marks and citation omitted). To determine the boundaries that Congress sought to occupy within the field, "'we look to the federal statute itself, read in the light of its constitutional setting and its legislative history.'" *De Canas v. Bica*, 424 U.S. 351, 360 n.8 (1976) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 78-79 (1941) (Stone, J., dissenting)), *superseded by statute on other grounds as stated in Whiting*, 131 S. Ct. at 1974-75.

Conflict pre-emption can occur in one of two ways: where "compliance with both federal and state regulations is a physical impossibility," or "where the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 131 S. Ct. at 2501 (internal quotation marks and citations omitted). Courts must utilize their judgment to determine what constitutes an unconstitutional impediment to federal law, and that judgment is "informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Crosby*, 530 U.S. at 373.

Nothing the Court said in *Whiting* or *Arizona* altered this framework for pre-emption analysis. The Court, did, however provide important guidance for our application of the pre-emption doctrine to the Hazleton ordinances. The Court upheld Arizona's efforts to regulate the employment of unauthorized aliens through a business licensing law in *Whiting,* but largely rejected Arizona's efforts to enact its own immigration policies, both within and outside of the employment context, in *Arizona*. With those cases as our compass, we now reconsider our prior ruling upholding the District Court's permanent injunction.

## A.    The Employment Provisions

The relevant employment provisions of the IIRAO regulate and prohibit a broad range of economic interactions with unauthorized aliens. Section 4 of the IIRAO renders it

"unlawful for any business entity to knowingly recruit, hire for employment, or continue to employ, or to permit, dispatch, or instruct" any person without work authorization "to perform work in whole or in part within the City."  IIRAO § 4A.  "Work" is defined to include "any job, task, employment, labor, personal services, or any other activity for which compensation is provided, expected, or due, including but not limited to all activities conducted by business entities."  *Id.* § 3F.  The IIRAO's prohibitions also apply to any "agreement to perform any service or work or to provide a certain product in exchange for valuable consideration."  *Id.* § 3C.  "Every business entity that applies for a business permit" must "sign an affidavit . . . affirming that they do not knowingly utilize the services of or hire any person who is an unlawful worker."  *Id.* § 4A.

Any City resident may submit a complaint to Hazleton's Code Enforcement Office ("HCEO") alleging a violation of the employment provisions.  *Id.* § 4B(1).  Upon receipt of such a complaint, the HCEO requests identifying information about the alleged unlawful worker from the employing or contracting business entity.  That business entity must then provide the requested information within three business days, or Hazleton will suspend its business license.  *Id.* § 4B(3).  The HCEO then submits the identity information to the federal government, pursuant to 8 U.S.C. § 1373, for verification of "the immigration status of such person(s)."  *Id.*[8]

---

[8] 8 U.S.C. § 1373(a) provides:

> Notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual.

12

If the HCEO confirms that the worker lacks authorization to work in the United States, the business must terminate that worker within three business days or the City will suspend its business license. *Id.* § 4B(4). A business whose license has been suspended under the IIRAO regains its license one business day after it submits an affidavit affirming that it has terminated the unauthorized worker. *Id.* § 4B(6). After a second or subsequent violation of the IIRAO, Hazleton suspends the business's license for a minimum of twenty days and reports the violation to the federal government. *Id.* § 4B(7).

Safe harbor from the IIRAO's sanctions is available for businesses that verify the work authorization of their workers using the federal E-Verify program. *Id.* § 4B(5). In addition, the IIRAO requires that City agencies and businesses that contract with the City for amounts greater than $10,000 must enroll in E-Verify. *Id.* §§ 4C, 4D. Those business entities found to have utilized the work of two or more unlawful workers at one time must enroll in E-Verify in order to recover their license. *Id.* § 4B(6)(b).

We previously held that the IIRAO's employment provisions, though not expressly pre-empted, are conflict pre-empted. *Lozano II*, 620 F.3d 210-19. However, in *Chamber of Commerce v. Whiting*, 132 S. Ct. 1968 (2011), the Supreme Court upheld an Arizona statute that allowed state courts to suspend or revoke the business licenses of employers who knowingly or intentionally employ unauthorized aliens and required that all Arizona employers use E-Verify. Accordingly, we will first consider whether our analysis in *Lozano II*, concluding that the IIRAO conflicts with federal law, survives *Whiting*.

In *Whiting*, the Supreme Court considered whether the employer sanctions provisions of the Legal Arizona Workers Act ("LAWA") were pre-empted by the Immigration Reform and Control Act of 1986 ("IRCA"), Pub. L. No. 99-603, 100 Stat. 3359 (codified at 8 U.S.C. §§ 1324a-1324b). The Court held that those provisions were not expressly pre-empted because they fell "squarely" within the confines of IRCA's

13

savings clause. That provision of IRCA "expressly preempts States from imposing 'civil or criminal sanctions' on those who employ unauthorized aliens, '*other than through licensing and similar laws*.'" *Whiting*, 131 S. Ct. at 1977 (quoting 8 U.S.C. § 1324a(h)(2)) (emphasis added).[9] The Court also held that Arizona's licensing law did not conflict with federal law, and therefore was not impliedly pre-empted. *Whiting*, 131 S. Ct. at 1981-85. The Court noted that the Arizona statute "simply implement[ed] the sanctions that Congress expressly allowed Arizona to pursue through licensing laws," and "Arizona went the extra mile in ensuring that its law closely tracks IRCA's provisions in all material respects." *Id*. at 1981.[10]

The Court in *Whiting* also held that the Illegal Immigration Reform and Immigrant Responsibility Act of

---

[9] This part of the decision in *Whiting* is consistent with our analysis in *Lozano II*. There, we held that the employment provisions in the IIRAO were not expressly pre-empted because they constituted a "licensing [or] similar law[]," exempted from express pre-emption under 8 U.S.C. § 1324a(h)(2). *Lozano II*, 620 F.3d at 207-10. Like Arizona's licensing law, the employment provisions here "fall[] . . . within the confines of the authority Congress chose to leave to the States and therefore is not expressly preempted." *Whiting*, 131 S. Ct. at 1981.

[10] For example, the Arizona law: (i) "adopt[s] the federal definition of who qualifies as an 'unauthorized alien'"; (ii) "expressly provides that state investigators must verify the work authorization of an allegedly unauthorized alien with the Federal Government" and prohibits any independent state determination; (iii) like the federal law, prohibits "'knowingly' employing an unauthorized alien" and requires that the prohibition be interpreted consistently with federal laws; and (iv) "provides employers with the same affirmative defense for good-faith compliance with the I-9 process as does the federal law" and provides employers "a rebuttable presumption of compliance with the law when they use E-Verify." *Whiting*, 131 S. Ct. at 1981-82. We will describe the "I-9" verification process *infra*.

1996 ("IIRIRA"), Pub. L. No. 104-208, 110 Stat. 3009 (1996) (codified as amended in various sections of 8 U.S.C.), which established the optional program now known as E-Verify, did not pre-empt Arizona's requirement that all employers use E-Verify. *Whiting*, 131 S. Ct. at 1985-86. The Court reasoned that the IIRIRA provision setting up E-Verify "contains no language circumscribing state action," *id.* at 1985, and Arizona's use of E-Verify "in no way obstructs achieving [Congress's] aims," *id.* at 1986.

The plurality opinion in *Whiting* rejected or otherwise undermined several aspects of our analysis in *Lozano II* insofar as we held that the IIRAO's employment provisions were conflict pre-empted.

First, *Whiting* contradicts our conclusion that the employment provisions in Hazleton's ordinance impede congressional objectives by creating a separate and independent process for determining whether an employer is guilty of employing unauthorized aliens. *Compare Whiting*, 131 S. Ct. at 1981 (rejecting the Chamber's argument that Congress intended the federal system to be exclusive and therefore any state system necessarily conflicts with federal law) *with Lozano II*, 620 F.3d at 213 ("The crux of this conflict . . . is rooted in the fact that Hazleton has established an alternate system *at all*."). Since Congress expressly allowed states to pursue sanctions through licensing laws, the *Whiting* plurality reasoned that "Congress did not intend to prevent the States from using appropriate tools to exercise that authority." *Whiting*, 131 S. Ct. at 1981.

Second, in *Lozano II*, we reasoned that, by imposing additional sanctions on employers who hire unauthorized aliens without including an express anti-discrimination provision, the IIRAO would create "the exact situation that Congress feared: a system under which employers might quite rationally choose to err on the side of discriminating against job applicants they perceive to be foreign." *Lozano II*, 620 F.3d at 218. However, the *Whiting* plurality rejected a similar argument. Those Justices reasoned that LAWA did not displace IRCA's anti-discrimination provisions, and that

15

other federal and state laws provide "further protection . . . and strong incentive for employers not to discriminate." *Whiting*, 131 S. Ct. at 1984. Thus, the Court believed that, even without an express anti-discrimination provision in the state law, "[t]he most rational path for employers is to obey the law—both the law barring the employment of unauthorized aliens and the law prohibiting discrimination." *Id.*

Finally, the *Whiting* plurality undermined our reasoning in *Lozano II* to the extent that we found pre-emption because the City's employment provisions "coerce[] [the] use of E-Verify." *Lozano II*, 620 F.3d at 214. That conclusion is now foreclosed by *Whiting*'s approval of Arizona's requirement that *all* employers use E-Verify. *Whiting*, 131 S. Ct. at 1985-86. There, the Court concluded that the requirement does not conflict with the federal scheme because the consequences for failure to use E-Verify under both the Arizona law and federal law were the same: the employer forfeits an otherwise available rebuttable presumption of compliance. *Id.* The Court further reasoned that the requirement does not obstruct federal objectives because "the Federal Government has consistently expanded and encouraged the use of E-Verify." *Id.* at 1986.

Nevertheless, Plaintiffs here argue that even after *Whiting*, Hazleton's employment provisions remain impliedly pre-empted. Plaintiffs point first to the fact that the IIRAO's restrictions apply to a much broader range of actors and activities than Congress intended under IRCA. According to Plaintiffs, this basis for our prior finding of conflict pre-emption was not disturbed by *Whiting*. We agree.

Section 4 of the IIRAO makes it "unlawful for any business entity to knowingly recruit, hire for employment, or continue to employ, or to permit, dispatch, or instruct any person who is an unlawful worker to perform work . . . within the City." IIRAO § 4A. The IIRAO defines "business entity" to include any person "engaging in any activity, enterprise, profession, or occupation for gain, benefit, advantage, or livelihood, whether for profit or not for profit." *Id.* § 3A. The term specifically includes "self-employed individuals,

16

partnerships, corporations, contractors,[11] and subcontractors," *Id.* § 3A(1), and any entity that "possesses a business permit, . . . is exempt from obtaining such a business permit, . . . [or] is operating unlawfully without such a business permit." *Id.* § 3A(2).

In sharp contrast to the IIRAO, the federal prohibition in IRCA reaches only "hir[ing]" or "recruit[ing] or refer[ring] for a fee, *for employment* in the United States." 8 U.S.C. § 1324a(a)(1)(A) (emphasis added). In striking the intricate balance that lead to the enactment of IRCA, Congress deliberately excluded independent contractors and other non-employees from the scope of the restrictions contained in the statute. *Arizona*, 132 S. Ct. at 2504. ("Congress enacted IRCA as a comprehensive framework for 'combating the *employment* of illegal aliens.'") (emphasis added) (quoting *Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137, 147 (2002)). As we explained previously:

> In drafting IRCA, Congress explicitly declined to sanction employers based on the work authorization status of "casual hires (i.e., those that do not involve the existence of an employer/employee relationship)." H.R. Rep. No. 99-682(I), [at 57], 1986 U.S.C.C.A.N. 5649, 5661. This was not an unreasoned choice, but part of the crafting of the statute to minimize the burden placed on employers. As the court explained in *Edmondson*, "[e]mployers are not required [under federal law] to verify the work eligibility of independent contractors" because it "would increase the burdens on business." 594 F.3d at

---

[11] The term "contractor" is further defined to include any "person, employer, subcontractor or business entity that enters into an agreement to perform any service or work or to provide a certain product in exchange for valuable consideration." IIRAO § 3C.

767. Businesses utilize independent contractors, in part, to reduce the costs and liabilities associated with procuring labor when an enduring and structured relationship is not needed. Compelling businesses to concern themselves with the work authorization status of contractors alters this relationship, and also raises costs.

*Lozano II*, 620 F.3d at 216-17 (alterations in original).

Under IRCA, employers are not required to verify contractors' work eligibility, as they must with employees. *See* 8 C.F.R. § 274a.2(b) (requiring employers to verify work eligibility of employees); § 274a.1(f) (excluding "independent contractor" and "those engaged in casual domestic employment" from the definition of "employee"); *id.* § 274a.1(g) (excluding those who use "contract labor" from the definition of "employer").[12] Given the intricate framework of IRCA, we cannot assume that the distinction is immaterial. Rather, it appears to be a deliberate distinction that Congress included as part of the balance it struck in determining the scope and impact of IRCA's employer sanctions. However, Hazleton's ordinance does not distinguish between employees, on the one hand, and independent contractors or

---

[12] Employers are, however, liable for *knowingly* utilizing the services of independent contractors who lack work authorization. 8 U.S.C. § 1324a(a)(4) ("[A] person or other entity who uses a contract, subcontract, or exchange . . . to obtain the labor of an alien . . . knowing that the alien is an unauthorized alien . . . shall be considered to have hired the alien for employment . . . in violation of [8 U.S.C. § 1324a](1)(A)."). However, this provision does not undermine Congress's intent to restrict IRCA's applicability to the employer/employee context. Rather, the purpose was to close a "loophole" so that employers may not use independent contractors to circumvent IRCA's prohibition on the employment of unauthorized workers. *See* H.R. Rep. No. 99-682(I), at 62, 1986 U.S.C.C.A.N. 5649, 5666.

18

casual hires, on the other.

The breadth of the reach of the IIRAO's sanctions operates in tandem with the fact that the IIRAO provides a safe harbor only if "prior to the date of the violation, the business entity had verified the work authorization of the alleged unlawful worker(s)" using the E-Verify program. IIRAO § 4B(4). Accordingly, the Hazleton scheme compels employers to verify the status of independent contractors and casual hires in order to obtain a safe harbor. In *Lozano II*, we determined that although the IIRAO only coerces, without directly requiring, verification of non-employees' work authorization, the coercion is equally problematic for preemption purposes because the IIRAO subjects employers to sanctions if those non-employees lack work authorization. *Lozano II*, 620 F.3d at 217.[13]

---

[13] The City argues that, in practice, the IIRAO would treat independent contractors in a manner similar to federal law under 8 U.S.C. § 1324a(a)(4)—only those who *knowingly* use the services of contactors who lack work authorization would face sanctions. For the reasons explained above, we disagree. Further, the IIRAO's terms reach as far as union organizing activity and the activity of not for profit organizations that refer individuals for employment but without a fee or profit motive. *See* IIRAO § 3A, 4A. Federal regulations specifically exclude "union hiring halls that refer union members or non-union individuals who pay union membership dues." 8 C.F.R. § 274a.1(d)-(e); *see also* H.R. Rep. 99-682(I), at 57, 1986 U.S.C.C.A.N. 5649, 5660 (noting exception for unions and similar entities). These "[f]ederal regulations have no less pre-emptive effect than federal statutes." *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982). Moreover, as we will explain, in addition to reaching a broader range of actors, the IIRAO's employment provisions also sanction a broader range of activities than does IRCA. Because the terms of the IIRAO sweep so broadly, even if we were to accept the City's position that the IIRAO and IRCA treat independent contractors similarly, it would not save the IIRAO from preemption.

Moreover, we must assess the extraordinarily broad definition of the persons and entities covered by the IIRAO together with the equally broad definition of the *activities* covered by the IIRAO. The IIRAO defines "work" to include "any job, task, employment, labor, personal services, or any other activity for which compensation is provided, expected, or due, including but not limited to all activities conducted by business entities." IIRAO § 3F. The IIRAO's prohibitions also apply to any "agreement to perform any service or work or to provide a certain product in exchange for valuable consideration." *Id.* § 3C. Moreover, there is no requirement that the alleged unauthorized work be performed at the location associated with an entity's business license, or even in connection with the activities for which an entity has a business license, for it to be considered a violation of the IIRAO.[14] Thus, under a literal reading of the IIRAO, the HCEO may revoke the business license of any person or entity if, for example, s/he purchases used items at a yard sale from an unauthorized alien, buys a glass of lemonade from an undocumented child's lemonade stand, or pays an undocumented neighbor to mow her lawn—even if such conduct is entirely unrelated to the actor's licensed business activity.

Indeed, it is difficult for us to conceive of any activity that is even remotely economic in nature, conducted by any person or entity in Hazleton, that would not be swept into the broad expanse of the IIRAO. We believe that prohibiting such a broad array of commercial interactions, based solely on immigration status, under the guise of a "business licensing" law is untenable in light of Congress's deliberate decision to limit IRCA's reach to the employer-employee relationship.

*Whiting* is not to the contrary. The City argues that the Court in *Whiting* was not troubled by the fact that Arizona's law applied to independent contractors. However, the

---

[14] Rather, the IIRAO expressly states that "work" includes, but "*is not limited to* all activities conducted by business entities." IIRAO § 3F (emphasis added).

provisions to which the City refers were added as part of a 2008 amendment to LAWA, and as the Supreme Court expressly noted, the 2008 amendments "were not part of the statute when [the] suit was brought, they are not before us and we do not address their interaction with federal law." *Whiting*, 131 S. Ct. at 1986 n.10; *see also Arizona Contractors Ass'n v. Candelaria*, 534 F. Supp. 2d 1036, 1053 (D. Ariz. 2008) ("[L]ike IRCA, [LAWA's] restrictions apply only with respect to those persons who have an 'employment relationship' with an employer, so it does not include casual hires."), *aff'd sub nom. Chicanos Por La Causa, Inc. v. Napolitano*, 558 F.3d 856 (9th Cir. 2009), *aff'd sub nom.*, *Chamber of Commerce v. Whiting*, 131 S. Ct. 1968 (2011).

Thus, unlike the IIRAO, the Arizona law upheld by the Supreme Court "closely track[ed] IRCA's provisions in all material respects," *Whiting*, 131 S. Ct. at 1981, including IRCA's precisely tailored reach.[15] Thus, *Whiting* alone does not support the proposition that an ordinance that diverges from federal law to the extent the IIRAO does is similarly sheltered from the reach of federal pre-emption.

The Supreme Court's more recent decision in *Arizona v. United States*, 132 S. Ct. 2492 (2012), further undermines the contention that the IIRAO should be upheld as a protected business licensing law. The Court in *Arizona* affirmed that "the existence of an express pre-emption provisio[n] does *not* bar the ordinary working of conflict pre-emption principles or impose a special burden that would make it more difficult to establish the preemption of laws falling outside the clause." *Arizona*, 132 S. Ct. at 2504-05 (internal quotation marks and citation omitted) (alteration in original). Moreover, the Court's reasons for finding that § 5(C) of Arizona's S.B. 1070 law conflicted with IRCA apply with equal force to the

---

[15] Indeed, the Court in *Whiting* noted that the Arizona law tracked the provisions of the federal law so tightly that if the Arizona law was pre-empted, "there really is no way for the State to implement licensing sanctions, contrary to the express terms of the savings clause." 131 S. Ct. at 1987. That is clearly not the situation here with the IIRAO.

21

IIRAO's attempt to extend its regulations beyond the employer-employee relationship. Section 5(C) of S.B. 1070 made it a state crime to seek or engage in work without federal authorization. In concluding that that provision was pre-empted, the Supreme Court stated, "Congress enacted IRCA as a comprehensive framework for 'combating the employment of illegal aliens,'" and IRCA, by design, "does not impose federal criminal sanctions on the employee side (*i.e.*, penalties on aliens who seek or engage in unauthorized work)." *Arizona*, 132 S. Ct. at 2504. Thus, the Court concluded that "[a]lthough § 5(C) attempts to achieve one of the same goals as federal law—the deterrence of unlawful employment—it involves a conflict in the method of enforcement" and is therefore pre-empted. *Id.* at 2505. Just as purposely as Congress limited the scope of IRCA's coverage to exclude independent contractors, Hazleton purposely stretched the IIRAO to include them. The result is a local ordinance that conflicts with Congress's intent to limit IRCA's application to the employer/employee relationship. *See Arizona*, 132 S. Ct. at 2505 ("[A] '[c]onflict in technique can be fully as disruptive to the system Congress enacted as conflict in overt policy.'" (citing *Motor Coach Employees v. Lockridge*, 403 U.S. 274, 287 (1971))). Accordingly, like § 5(C) of Arizona's S.B. 1070, the IIRAO employment provisions conflict with IRCA.

In *Lozano II*, we also concluded that the IIRAO conflicts with IRCA because it does not provide an affirmative defense to employers who comply with the I-9 process to verify immigration status. *Lozano II*, 620 F.3d at 214-15.[16] Plaintiffs argue that this conclusion was also not

---

[16] The "I-9" process derives its name from the form that IRCA requires employers to complete.

> IRCA requires that employers . . . confirm an employee's authorization to work by reviewing the employee's United States passport, resident alien card, alien registration card, or other document approved by the Attorney General; or by reviewing a combination

22

disturbed by *Whiting* because the Arizona law at issue there provided a safe harbor for I-9 compliance. Once again, we agree.

As we have explained:

> Congress paid considerable attention to the costs IRCA would impose on employers, *see e.g.*, H.R. Rep. No. 99-682(I), at [90], 1986 U.S.C.C.A.N. 5649, 5694 ("Considerable discussion was generated during the processing of [this bill] to the effect the employer sanctions provisions were placing an undue burden on employers in requiring them to do the paperwork and keep records on employees."), and drafted the legislation in a manner that would minimize those burdens, *see, e.g.*, 132 Cong. Rec. H10583-01 (daily ed. Oct. 15, 1986) (statement of Rep. Bryant) (IRCA has been "carefully designed for the minimum burden necessary . . . to be effective.").

---

> of other documents such as a driver's license and social security card. § 1324a(b)(1)(B)-(D). The employer must attest under penalty of perjury on Department of Homeland Security Form I-9 that he "has verified that the individual is not an unauthorized alien" by reviewing these documents. § 1324a(b)(1)(A). The form I-9 itself "and any information contained in or appended to [it] . . . may not be used for purposes other than for enforcement of" IRCA and other specified provisions of federal law. § 1324a(b)(5).

*Whiting*, 131 S. Ct. at 1974.

23

*Lozano II*, 620 F.3d 211. As part of this effort, Congress created the I-9 process as a uniform federal system by which employers must verify the work authorization of new hires. Under IRCA, good-faith compliance with the I-9 process provides an employer with an affirmative defense if charged with a violation of 8 U.S.C. § 1324a. 8 U.S.C. § 1324a(a)(3); H.R. Rep. No. 99-682 (I), at 57. However, Hazleton's scheme does not provide any safe harbor for employers who use the I-9 process. The IIRAO's employment provisions thus contravene congressional intent for the I-9 process to serve as an acceptable way of protecting against sanctions and Congress's desire to avoid placing an undue burden on employers. As we previously explained:

> By making the I-9 system a uniform national requirement, Congress limited the compliance burden on interstate corporations while facilitating uniform enforcement. A uniform system reduces costs for employers with multiple locations throughout the country by ensuring that the same human resources procedures can be used in all locations. Hazleton's scheme denies interstate employers who use the I-9 process the benefits of uniformity. Interstate employers with locations in Hazleton (who wish to ensure safe harbor in all locations) would either have to adhere to different regulations in different locations, or use E-Verify in all locations.

*Lozano II*, 620 F.3d at 215 (internal quotation marks and citation omitted).

Although the Supreme Court in *Whiting* upheld Arizona's requirement that all employers enroll in E-Verify, the Court's holding did not negate the importance of the I-9 process to the federal scheme. Rather, the Court's holding was based upon its conclusion that "the consequences of not

24

using E-Verify under the Arizona law are the same as . . . under the federal law," *Whiting*, 131 S. Ct. at 1985,[17] and "[t]he Arizona law provides employers with the same affirmative defense for good-faith compliance with the I-9 process as does the federal law," *id.* at 1982. Thus, although Arizona "required" employers to use E-Verify, that "requirement" was exactly the same as the federal law's treatment of E-Verify, and similarly, Arizona treated I-9 compliance the same way that federal law treated I-9 compliance.

The City argues that the lack of an affirmative defense for I-9 compliance is irrelevant given the structure of the Hazleton scheme, which does not rely on a judicial process for proving that an employer knowingly hired an unauthorized alien and assessing a penalty. In addition to highlighting procedural due process concerns, this assertion elevates form over function and misses the point. The significance of the I-9 affirmative defense is the safe harbor it provides for employers. We are therefore not impressed with a distinction between judicially imposed sanctions and

---

[17] Under both the Arizona and federal law, the only consequence of not using E-Verify is forfeiture of the otherwise available rebuttable presumption of compliance with the law. *Whiting*, 131 S. Ct. at 1985-86. As we explained, *supra*, the Supreme Court explicitly noted that, during the course of the litigation, Arizona had amended its statute. The amendments included, *inter alia*, the attachment of "other consequences, such as the loss of state-allocated economic development incentives" to a failure to use E-Verify. *Id.* at 1986 n.10. Because those amendments "were not part of the statute when [the] suit was brought," the Court was careful to explain that "they are not before us and we do not address their interaction with federal law." *Id.* In this regard, we note that the IIRAO attaches an additional penalty to a failure to use E-Verify: disqualification from city contracts greater than $10,000. IIRAO § 4D. This additional sanction for failure to use E-Verify goes beyond a mere licensing provision and is yet another reason the IIRAO conflicts with federal law.

administratively imposed sanctions. The resulting impact on a given business appears indistinguishable. Whether a judicial officer or an administrator is charged with imposing sanctions is irrelevant. The City insists that the drafters of Hazleton's ordinances attempted to construct a parallel regulatory scheme that would comply with IRCA's savings clause. However, the City's decision to omit a safe harbor for I-9 compliance, while providing one for those who use E-Verify, *see* IIRAO § 4B(5), is not as inconsequential as the City would have us believe. A scheme providing a safe harbor for both verification procedures would have been much closer to the parallel regulatory scheme that the Court upheld in *Whiting*. Absent that, an important aspect of the federal scheme is undermined.

*Geier v. American Honda Motor Co.*, 529 U.S. 861 (2000), further illustrates how Hazleton's disregard of the I-9 process impedes federal objectives. There, Alexis Geier suffered serious injuries when the Honda she was driving crashed into a tree. She sued the auto company alleging that her injuries resulted from the absence of airbags, which she claimed was a design defect. *Id.* at 865. However, Geier's car had automatic belts and thus complied with applicable federal safety standards, which, rather than requiring airbags, "allow[ed] manufacturers to choose among different passive restraint mechanisms, such as airbags, automatic belts, or other passive restraint technologies." *Id.* at 878. The applicable federal statute, however, also stated that "[c]ompliance with a federal safety standard does not exempt any person from liability under common law." *Id.* at 868 (internal quotation marks omitted, bracket in original). Nonetheless, the manufacturer argued that the plaintiff's claim for damages was pre-empted by federal law. The Court had to decide "whether the Act pre-empts a state common-law tort action in which the plaintiff claims that the . . . manufacturer, who was in compliance with the standard, should nonetheless have equipped [her] automobile with airbags." *Id.* at 865.

The Supreme Court held that the tort action conflicted with federal law and was thus pre-empted. *Id.* at 874. The

Court reasoned that federal regulations sought "a variety and mixture of [safety] devices" and "deliberately imposed" a "gradual passive restraint phase in." *Id.* at 881. Notwithstanding the savings clause, allowing the action to proceed when plaintiff's car complied with the applicable federal safety standard "would have stood 'as an obstacle to the accomplishment and execution of' [those] important . . . federal objectives." *Id.* (quoting *Hines*, 312 U.S. at 67). Similarly, permitting Hazleton to impose sanctions on employers who have complied with, and relied upon, the I-9 process would obstruct important federal objectives. Congress wanted to make the I-9 process available as a uniform means of protecting against such sanctions and minimizing the burden on employers. *See also Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 156 (1982) (finding conflict pre-emption where state law limited the availability of due-on-sale provisions in loan instruments, which federal regulators deemed "essential to the economic soundness of the thrift industry").

The IIRAO's lack of procedural protections presents yet another "'obstacle to the accomplishment and execution of the full purposes and objectives'" of federal law. *See Arizona*, 131 S. Ct. at 2501 (quoting *Hines*, 312 U.S. at 67). The IIRAO provides substantially fewer procedural protections than IRCA, which circumscribed sanctions with a detailed hearing and adjudication procedure. Under IRCA, only complaints with a "substantial probability of validity" are investigated. 8 U.S.C. § 1324a(e)(1)(B). In contrast, under the IIRAO, any superficially valid complaint is investigated. IIRAO §§ 4B(1), (3). In addition, when enacting IRCA, Congress mandated that an employer be provided with notice and an opportunity for a hearing, 8 U.S.C. § 1324a(e)(3)(A), and an administrative law judge must find the employer guilty of violating IRCA by a preponderance of the evidence before any sanctions can be imposed, *id.* § 1324a(e)(3)(C). That employer also has a right to an administrative appeal and judicial review. *Id.* § 1324a(e)(7)-(8). In marked contrast, the IIRAO *requires* the HCEO to *immediately* suspend the business license of any entity that fails to provide requested information about

alleged unlawful workers within three business days. IIRAO § 4B(3).[18] If a business entity does not terminate an unauthorized worker within three days of being notified that the worker is not authorized, the City immediately suspends that entity's business license. *Id.* § 4B(4).[19] Thus, the burdens imposed on businesses under the Hazleton scheme are greater than those Congress elected to impose under the similar, but distinct approach of IRCA.

The procedures in LAWA (the Arizona statute upheld in *Whiting*), substantially track the procedures Congress established under IRCA. In contrast to the immediate suspension of business licenses authorized by the IIRAO, sanctions under LAWA, like under IRCA, could only be imposed after the attorney general or county attorney brings an enforcement action in state court. A.R.S. § 23-212(D) (effective Sept. 19, 2007 to Apr. 30, 2008). The state court was directed to provide a "hearing at the earliest practicable date," *id.* § 22-212(E), and sanctions could only be imposed by the court after determining that there had been a violation, *id.* § 23-212(F).[20]

Conversely, the lack of procedural protections in the IIRAO's employment provisions undermines the delicate balance Congress erected for enforcing the prohibition on hiring unauthorized aliens. Congress was clearly concerned

------

[18] IIRAO § 4B(3) states: the HCEO "shall suspend the business permit of any entity which fails, within three business days after receipt of the request [for identity information regarding alleged unlawful workers], to provide such information."

[19] IIRAO § 4B(4) provides that the HCEO "shall suspend the business permit of any business entity which fails [to] correct a violation of this section within three business days after notification of the violation by the [HCEO]."

[20] *See also Chicanos Por La Causa, Inc. v. Napolitano*, 558 F.3d 856, 868-69 (9th 2009) (describing procedures to be followed under LAWA and holding that LAWA provided adequate due process).

with avoiding undue burdens on employers. *See, e.g.*, H.R. Rep. No. 99-682(I), at 56 (describing desire for employer sanctions to be implemented in a manner that "would be the least disruptive to the American businessman"); S. Rep. No. 99-132, at 35 (1985) (expressing concern regarding "harassment . . . against innocent employers" and noting that "[s]pecific protections have been included to minimize the risk of these undesirable results"). As the Supreme Court noted, "Congress did indeed seek to strike a balance among a variety of interests when it enacted IRCA." *Whiting*, 131 S. Ct. at 1984.[21] It is therefore apparent that the lack of minimal procedural protections in Hazleton's ordinance further undermines the express congressional objective of minimizing undue burdens on, and harassment of, employers.

Accordingly, although the Court's recent decisions in *Whiting* and *Arizona* alter some of our previous analysis, neither opinion alters the outcome of this dispute. For the reasons we have set forth above, we again hold that the employment provisions of the IIRAO are pre-empted because they "stand[] as an obstacle to the accomplishment and execution" of IRCA's objectives, *Hines*, 312 U.S. at 67, and were properly enjoined by the District Court.[22]

---

[21] The Court in *Whiting* concluded that a failure to include an express anti-discrimination provision was not fatal to Arizona's employer sanctions law and that the Arizona law did not otherwise upset the balance of interests that Congress intended. *Whiting*, 131 S. Ct. at 1984. However, nothing in *Whiting* undermines the conclusion that IRCA indeed represents a careful congressional balance of competing interests, including, *inter alia*, preventing undue burden on employers.

[22] The City argues that the standard articulated in *United States v. Salerno*, 481 U.S. 739 (1987), precludes a finding of pre-emption and that *Arizona* supports its position in this regard. We disagree. Although Justice Scalia's and Justice Alito's opinions in *Arizona* cite *Salerno* and espouse the City's approach, *see Arizona*, 132 S. Ct. at 2515 (Scalia, J., concurring in part and dissenting in part); *id.* at 2534 (Alito, J., concurring in part and dissenting in part), no part of

## B.     The Housing Provisions

The housing provisions at issue in this litigation are found in both the IIRAO and the RO. The RO sets up a rental registration scheme that operates in conjunction with anti-

---

the majority opinion in *Arizona*, and no part of *Whiting*, references *Salerno* at all. The plurality in *Whiting* and majority in *Arizona* did not adopt the approach the City asks us to adopt. That approach would reject a conflict pre-emption claim in a facial challenge whenever a defendant can conjure up just one hypothetical factual scenario in which implementation of the state law would not directly interfere with federal law. Indeed, if this were the standard governing the Supreme Court's review of Arizona's S.B. 1070 law, many of the sources of conflict with federal law described by the Court would have been irrelevant to the Court's conflict pre-emption analysis. For example, the Court in *Arizona* concluded that § 6, which authorized state and local police to arrest certain potentially removable individuals, conflicted with federal law in part because it interfered with federal enforcement discretion and could target and harass individuals the federal government does not seek to remove. *Arizona*, 132 S. Ct. at 2506-07. However, under the City's approach, this conflict is irrelevant in a facial challenge because, in at least *some* circumstances, the local police could be arresting individuals whom the federal government *does* want removed and whose arrest would not otherwise conflict with federal policy. To the contrary, however, the Court in *Arizona* found this potential conflict consequential.

The analysis of § 2(B) in *Arizona* also fails to support the City's position. The Court vacated a preliminary injunction against § 2(B) and remanded for further fact finding because the provision, on its face, was ambiguous, and Arizona's courts may construe § 2(B) in a way that would preclude *any* unconstitutional applications of the law. *Arizona*, 132 S. Ct. at 2509-10. The Court, however, did not reject a facial challenge against the provision pursuant to the City's theory, *i.e.*, because implementation of § 2(B), in *some* circumstances may be in harmony with federal law.

30

harboring provisions in the IIRAO to prohibit unauthorized aliens from residing in any rental housing within the City.

The RO requires any prospective occupant of rental housing over the age of eighteen to apply for and receive an occupancy permit. RO § 1m, 6a, 7b. To receive the permit, the prospective occupant must pay a ten-dollar fee and submit certain basic information and "[p]roper identification showing proof of legal citizenship and/or residency" to the HCEO. *Id.* § 7b. Landlords must inform all prospective occupants of this requirement, and landlords are prohibited from allowing anyone over the age of eighteen to rent or occupy a rental unit without registering with the City and receiving a permit. *Id.* § 6a, 7b. A landlord found guilty of violating these requirements must pay an initial fine of $1000 per unauthorized occupant. *Id.* § 10b. That landlord is also subject to an additional fine of $100 per day, per unauthorized occupant, until the violation is corrected. Authorized occupants of rental housing who allow anyone without an occupancy permit to reside with them are subject to the same fines. *Id.* § 10c.

As we mentioned earlier, the anti-harboring provisions in the IIRAO make legal immigration status a condition precedent to entering into a valid lease. IIRAO § 7B. A tenant lacking lawful status "who enters into such a contract shall be deemed to have breached a condition of the lease." *Id.* The IIRAO makes it "unlawful for any person or business entity that owns a dwelling unit in the City to harbor an illegal alien in the dwelling unit, knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law." *Id.* § 5A. "Harboring" is broadly defined to include "let[ting], leas[ing], or rent[ing] a dwelling unit to an illegal alien." *Id.* § 5A(1). An "illegal alien" is defined as "an alien who is not lawfully present in the United States, according to the terms of United States Code Title 8, section 1101 et seq." *Id.* § 3D.

We previously found the housing provisions in the IIRAO and the RO pre-empted on three separate pre-emption

grounds.[23]   No part of *Whiting* or *Arizona* considered provisions of a state or local ordinance that, like the housing provisions here, prohibit, and define "harboring" to include, allowing unauthorized aliens to reside in rental housing. Moreover, nothing in *Whiting* or *Arizona* undermines our analysis of the contested housing provisions here.   On the contrary, the Court's language reinforces our view that Hazleton's attempt to prohibit unauthorized aliens from renting dwelling units in the City are pre-empted.

> 1. *The Housing Provisions Constitute Impermissible Regulation of Immigration and Are Field Pre-empted.*

We begin this part of our analysis by noting that the Supreme Court was careful in *Arizona* to stress the important national interests that are implicated when local governments attempt to regulate immigration and the concomitant need to leave such regulation in the hands of the federal government.

The federal power to determine immigration

---

[23] In *Lozano II*, we determined that the presumption against pre-emption applied to our analysis of the employment provisions, *Lozano II*, 620 F.3d at 206-07, but did not apply to our analysis of the housing provisions, *id.* at 219.  We find unpersuasive the City's argument that we erred in failing to apply the presumption to the housing provisions and see nothing in *Arizona* or *Whiting* suggesting otherwise.  The housing provisions attempt to regulate who may live within Hazleton based solely on immigration status.  In this area of "significant federal presence," we will not apply the presumption against pre-emption.  *See United States v. Locke*, 529 U.S. 89, 108 (2000); *see also United States v. Alabama*, 691 F.3d 1269, 1296-97 (11th Cir. 2012) (concluding that state law prohibiting courts from recognizing contracts with aliens lacking lawful immigration status "constitutes a thinly veiled attempt to regulate immigration under the guise of contract law," and thus, the presumption against pre-emption does not apply, but even if it does, the law is pre-empted), *cert. denied*, 569 U.S. __, 133 S. Ct. 2022 (2013).

> policy is well settled. Immigration policy can affect trade, investment, tourism, and diplomatic relations for the entire Nation, as well as the perceptions and expectations of aliens in this country who seek the full protection of its laws.

*Arizona*, 132 S. Ct. at 2498. In finding three of the four challenged provisions in *Arizona* pre-empted, the Court reiterated the primacy of the federal government's concern for the treatment and regulation of aliens in this country.

In *Lozano II,* we held that the housing provisions impermissibly "regulate immigration" in contravention of the Supreme Court's pronouncement that a state or locality may not determine "'who should or should not be admitted into the country, and the conditions under which a legal entrant may remain.'" *Lozano II,* 620 F.3d at 220 (quoting *De Canas,* 424 U.S. at 355).[24] In concluding that the housing provisions constituted impermissible regulation of immigration, we recognized that "the fact that aliens are the subject of a state statute does not render it a regulation of

---

[24] *See also Villas at Parkside Partners v. Farmers Branch,* __ F.3d __, 2013 WL 3791664, at *15 (5th Cir. July 22, 2013) (en banc) (Reavley, J., concurring) ("Because the sole purpose and effect of this [housing] ordinance is to target the presence of illegal aliens within the city . . . and to cause their removal, it contravenes the federal government's exclusive authority on the regulation of immigration and the conditions of residence in this country, and it constitutes an obstacle to federal authority over immigration and the conduct of foreign affairs."); *id.* at *16 (Dennis, J., concurring) ("[T]he Ordinance is preempted in all of its core provisions by the comprehensive and interrelated federal legislative schemes governing the classification of noncitizens, the adjudication of immigration status, and the exclusion and deportation of noncitizens from the United States, enacted pursuant to the federal government's constitutional authority to administer a uniform national immigration policy.").

immigration." *De Canas*, 424 U.S. at 355. We did not hold that the housing provisions were a regulation of immigration simply because "aliens are the subject of" those provisions. Rather, we determined that "[t]hrough its housing provisions, Hazleton attempts to regulate *residence based solely on immigration status*." *Lozano II*, 620 F.3d at 220 (emphasis added). Thus, we concluded that enforcement of the housing provisions must be enjoined because "[d]eciding which aliens may live in the United States has always been the prerogative of the federal government." *Id.* The housing provisions of Hazleton's ordinances are nothing more than a thinly veiled attempt to regulate residency under the guise of a regulation of rental housing. By barring aliens lacking lawful immigration status from rental housing in Hazleton, the housing provisions go to the core of an alien's residency. States and localities have no power to regulate residency based on immigration status.

For these same reasons, we also concluded that the housing provisions are field pre-empted by the INA. That statute is centrally concerned with "'the terms and conditions of admission to the country and the subsequent treatment of aliens lawfully admitted.'" *Id.* (quoting *De Canas*, 424 U.S. at 359). The INA's comprehensive scheme "plainly precludes state efforts, whether harmonious or conflicting, to regulate residence in this country based on immigration status." *Id.* We noted that although Hazleton's housing provisions do not control actual physical entry into, or expulsion from, Hazleton or the United States, "in essence, that is precisely what they attempt to do." *Id.* at 220 (internal quotations marks and citation omitted). Again, we see nothing in the Supreme Court's decisions in *Whiting* or *Arizona* that undermines these conclusions.

Since our decision in *Lozano II*, a number of courts have concluded that state or local laws proscribing the harboring of aliens lacking lawful status are also field pre-empted because they intrude on the field of alien harboring. *See, e.g.*, *Ga. Latino Alliance for Human Rights v. Governor of Ga.*, 691 F.3d 1250, 1263-65 (11th Cir. 2012) ("*GLAHR*") (concluding that federal law occupies the field with respect to

"the entry, movement, and residence of aliens within the United States" and state law proscribing, *inter alia*, harboring is field pre-empted); *United States v. Alabama*, 691 F.3d 1269, 1285-87 (11th Cir. 2012) (same), *cert. denied*, 569 U.S. __, 133 S. Ct. 2022 (2013); *United States v. South Carolina*, 906 F. Supp. 2d 463, 468 (D.S.C. 2012) (concluding that provisions of state law proscribing transporting or sheltering aliens lacking lawful status "infringe upon a comprehensive federal statutory scheme"), *aff'd*, __ F.3d __, 2013 WL 3803464 (4th Cir. July 23, 2013); *Valle del Sol v. Whiting*, No. 10-1061, 2012 WL 8021265, at *5 (D. Ariz. Sept. 5, 2012) (concluding that state law proscribing, *inter alia*, harboring of aliens lacking lawful status is field pre-empted).

As the Eleventh Circuit Court of Appeals explained:

> The INA provides a comprehensive framework to penalize the transportation, concealment, and inducement of unlawfully present aliens. Pursuant to 8 U.S.C. § 1324(a)(1)(A)(ii)-(iv), it is a federal crime for any person to transport or move an unlawfully present alien within the United States; to conceal, harbor, or shield an unlawfully present alien from detection; or to encourage or induce an alien to "come to, enter, or reside in the United States." . . . Section 1324(c) permits local law enforcement officers to arrest for these violations of federal law, but the federal courts maintain exclusive jurisdiction to prosecute for these crimes and interpret the boundaries of the federal statute. *See id.* § 1329. Subsection (d) of § 1324 further dictates evidentiary rules governing prosecution of one of its enumerated offenses, and subsection (e) goes so far as to mandate a community outreach program to "educate the public in the United States and abroad about the

35

> penalties for bringing in and harboring aliens in violation of this section."

*GLAHR*, 691 F.3d at 1263-64. We agree with the Eleventh Circuit and other courts that have held that "the federal government has clearly expressed more than a 'peripheral concern' with the entry, movement, and residence of aliens within the United States and the breadth of these laws illustrates an overwhelmingly dominant federal interest in the field." *Id.* at 1264 (citation omitted).

The City argues that, by authorizing state and local officials to arrest individuals guilty of harboring, *see* 8 U.S.C. § 1324(c), Congress specifically invited state and local governments into this field. According to the City, this "invitation"—along with the requirement in 8 U.S.C. § 1373 that federal agencies respond to inquiries from states and localities regarding any alien's immigration status— forecloses any argument that the housing provisions are field pre-empted. However, while § 1324(c) allows state officials to arrest for violations of crimes enumerated in that section, the federal statute does not authorize states to prosecute those crimes. Instead, under federal law, the prosecution of such violations must take place in federal court and is at the sole discretion of federal officials. *See* 8 U.S.C. § 1329. "In the absence of a savings clause permitting state regulation in the field, the inference from these enactments is that the role of the state is limited to arrest for violations of federal [anti-harboring] law." *GLAHR*, 691 F.3d at 1264.

For the reasons explained above, we again hold that the housing provisions in the IIRAO and RO constitute an impermissible regulation of immigration and are field pre-empted because they intrude on the regulation of residency and presence of aliens in the United States and the occupied field of alien harboring.

### 2. *The Housing Provisions Are Conflict Pre-empted.*

In *Lozano II*, we concluded that the housing provisions

36

are also conflict pre-empted because they interfere with the federal government's discretion in, and control over, the removal process. The exercise of that discretion implicates important foreign policy considerations. *Arizona*, 132 S. Ct. at 2499. We also concluded that the housing provisions are inconsistent with federal anti-harboring law. Again, the subsequent decisions of the Supreme Court have not undermined our reasoning. In fact, as suggested above and explained below, the Court's subsequent decisions reinforce our prior conflict pre-emption analysis with respect to the housing provisions.

In *Arizona*, the Court emphasized that "[a] principle feature of the [INA's] removal system is the broad discretion exercised by immigration officials." *Arizona*, 132 S. Ct. at 2499. "Federal officials . . . must decide whether it makes sense to pursue removal at all [and,] [i]f removal proceedings are commenced, [whether] aliens may seek . . . discretionary relief allowing them to remain in the country or at least to leave without formal removal." *Id.*[25] Yet, by prohibiting the only realistic housing option many aliens have, Hazleton is clearly trying to prohibit unauthorized aliens from living within the City. As we explained in *Lozano II*, the housing provisions, in effect, constitute an attempt to remove persons from the City based entirely on a snapshot of their current immigration status. Accordingly, the housing provisions interfere with the federal government's discretion in deciding whether and when to initiate removal proceedings. *See Lozano II*, 620 F.3d at 221-22.[26]

---

[25] *See also Holder v. Martinez Gutierrez*, 566 U.S. __, 132 S. Ct. 2011, 2015 (2012) ("The immigration laws have long given the Attorney general discretion to permit certain otherwise-removable aliens to remain in the United States."); *Fid. Fed. Sav. & Loan Ass'n*, 458 U.S. at 154 ("Where Congress has directed an administrator to exercise his discretion, his judgments are subject to judicial review only to determine whether he has exceeded his statutory authority or acted arbitrarily.").

[26] In *Keller v. City of Fremont*, __ F.3d __, 2013 WL 3242111 (8th Cir. June 28, 2013), a divided panel of the

Indeed, interference with the federal removal process and the discretion entrusted to the Executive Branch are key reasons for the Supreme Court's conclusions that § 6 and § 3 of Arizona's S.B. 1070 law are conflict pre-empted. The Court reached that conclusion even though neither provision purports to physically remove any aliens from Arizona or the United States. In affirming an injunction against § 6, which would have given Arizona police authority to arrest an individual based on probable cause to believe the individual has committed a removable offense, the Court determined that the provision "would allow the State to achieve its own immigration policy," which could result in "unnecessary harassment of some aliens . . . whom federal officials determine should not be removed." *Arizona*, 132 S. Ct. at 2506. The Court also found that "[b]y authorizing state officers to decide whether an alien should be detained for being removable, § 6 violates the principles that the removal process is entrusted to the discretion of the Federal Government." *Id.* Similarly, in invalidating § 3, which

Court of Appeals for the Eighth Circuit has recently concluded that a local ordinance, almost identical to the housing provisions in the RO and IIRAO, does not interfere with federal removal discretion. The majority reasoned that the "rental provisions would only indirectly effect 'removal' of any alien from the City," in a manner comparable to how "denying aliens employment inevitably has the effect of 'removing' some of them from the State." *Id.* at *8. We disagree. Restricting housing touches directly on residency and federal removal discretion. As we explained in *Lozano II*, "[i]t is difficult to conceive of a more effective method of ensuring that persons do not enter or remain in a locality than by precluding their ability to live in it." *Lozano II*, 620 F.3d at 220-21 (internal quotation marks and citation omitted). The Eighth Circuit also concluded that the rental restrictions do not determine who should or should not be admitted into the country and do not conflict with federal anti-harboring law. *See Keller*, 2013 WL 3242111, at *5, *7. For the reasons explained above, we disagree with these conclusions as well.

38

criminalized failure to carry an alien registration document in violation of federal law, the Court noted that, in addition to intruding on a field occupied by Congress, the provision also conflicts with federal law because it would give Arizona the power to act "even in circumstances where federal officials . . . determine that prosecution would frustrate federal policies." *Id.* at 2503.

The same infirmities are evident here. Like the pre-empted provisions in *Arizona*, the housing provisions constitute an attempt to unilaterally attach additional consequences to a person's immigration status with no regard for the federal scheme, federal enforcement priorities, or the discretion Congress vested in the Attorney General. Congress has not banned persons who lack lawful status or proper documentation from obtaining rental or any other type of housing in the United States. Hazleton's decision to impose this "distinct, unusual and extraordinary burden[] . . . upon aliens" impermissibly intrudes into the realm of federal authority. *Hines*, 312 U.S. at 65-66. Through the housing provisions, Hazleton is seeking to achieve "its own immigration policy," one which will certainly result in "unnecessary harassment of some aliens . . . whom federal officials determine should not be removed." *Arizona*, 132 S. Ct. at 2506.

Hazleton may not unilaterally prohibit those lacking lawful status from living within its boundaries, without regard for the Executive Branch's enforcement and policy priorities. "If every other state enacted similar legislation to overburden the lives of aliens, the immigration scheme would be turned on its head." *United States v. Alabama*, 691 F.3d at 1295 n.21. Accordingly, the housing provisions conflict with federal law.

In addition to undermining the comprehensive procedures under which federal officials determine whether an alien may remain in this country, Hazleton's housing provisions would create significant foreign policy and humanitarian concerns. As the Court in *Arizona* emphasized, federal decisions in this arena "touch on foreign relations and

must be made with one voice." *Id.* at 2506-07. "'One of the most important and delicate of all international relationships . . . has to do with the protection of the just rights of a country's own nationals when those nationals are in another country.'" *Arizona*, 132 S. Ct. at 2498-99 (quoting *Hines*, 312 U.S. at 64). "It is fundamental that foreign countries concerned about the status, safety, and security of their nationals in the United States must be able to confer and communicate on this subject with one national sovereign, not the 50 separate states." *Id.* at 2498. In addition, "[p]erceived mistreatment of aliens in the United States may lead to harmful reciprocal treatment of American citizens abroad." *Id.* Accordingly, "[s]ome discretionary decisions [in the enforcement of immigration law] involve policy choices that bear on this Nation's international relations," and the exercise of such discretion "embraces immediate human concerns." *Id.* at 2499. "Returning an alien to his own country may be deemed inappropriate even where he has committed a removable offense or fails to meet the criteria for admission." *Id.*

The Supreme Court's recognition of the primacy of the national interest in regulations directly affecting aliens in this country reinforces our holding in *Lozano II* that Hazleton's attempt to regulate where aliens can live implicates strong national interests and must be done with a single voice.[27] Other federal courts that have addressed this issue agree that attempts to proscribe harboring or restrict certain forms of housing for aliens lacking lawful immigration status are

---

[27] We realize, of course, that "[t]he pervasiveness of federal regulation does not diminish the importance of immigration policy to the States." *Arizona*, 132 S. Ct. at 2500. Nonetheless, "'[t]he relative importance to the State of its own law is not material when there is a conflict with a valid federal law, for the Framers of our Constitution provided that the federal law must prevail.'" *Fid. Fed. Sav. & Loan Ass'n*, 458 U.S. at 153 (quoting *Free v. Bland*, 369 U.S. 663, 666 (1962)); *see also id.* (Conflict pre-emption "principles are not inapplicable here simply because real property law is a matter of special concern to the States.")

40

conflict pre-empted. Similarly, when the issue has been presented in the context of a preliminary injunction, courts have found a substantial likelihood of conflict pre-emption for reasons similar to those we have described. *See, e.g.*, *Villas at Parkside Partners v. Farmers Branch*, __ F.3d __, 2013 WL 3791664, at *8, *10 (5th Cir. July 22, 2013) (en banc) (concluding that local housing ordinance analogous to Hazleton's housing provisions conflicts with federal anti-harboring law and federal removal procedures); *GLAHR*, 691 F.3d at 1265-67 (concluding that state law proscribing, *inter alia*, harboring aliens lacking lawful status "presents an obstacle to the execution of the federal statutory scheme and challenges federal supremacy in the realm of immigration"); *United States v. Alabama*, 691 F.3d at 1287-88 (same); *United States v. South Carolina*, 906 F. Supp. 2d at 468 (concluding that provisions of state law proscribing transporting or sheltering aliens lacking lawful status would interfere with federal enforcement discretion), *aff'd*, __ F.3d __, 2013 WL 3803464 (4th Cir. July 23, 2013); *Valle del Sol*, 2012 WL 8021265, at *6 (concluding that state law proscribing, *inter alia*, harboring of aliens lacking lawful status conflicts with federal law because it interferes with federal enforcement discretion); *Keller v. City of Fremont*, 853 F. Supp. 2d 959, 972-73 (D. Neb. 2012), *rev'd*, 2013 WL 3242111 (8th Cir. June 28, 2013) (concluding that city ordinance penalizing harboring or the lease or rental of dwelling units to aliens lacking lawful status would impair "the structure Congress has established for classification, adjudication, and potential removal of aliens").

Despite the obvious trespass into matters that must be left to the national sovereign, the City continues to insist there is no conflict pre-emption because it is merely engaging in "concurrent enforcement" of federal immigration laws. Under that theory, virtually any local jurisdiction could prohibit activity that is also prohibited by federal law as long as the local prohibition is not expressly pre-empted and the locality is not acting in a field that is occupied by federal law. The City cites to a decision from the Ninth Circuit Court of Appeals in support of its contention: "Where state enforcement activities do not impair federal regulatory

interests concurrent enforcement activity is authorized." *Gonzales v. City of Peoria*, 722 F.2d 468, 474 (9th Cir. 1983), *overruled by Hodgers-Durgin v. de la Vina*, 199 F.3d 1037 (9th Cir. 1999). However, that argument collapses under its own weight. It requires that local enforcement activity *not impair federal regulatory interests*. It says nothing about the propriety of concurrent enforcement when the local enforcement *does* impair federal regulatory interests; yet, that is the situation here.

Moreover, the City's argument simply cannot be reconciled with the Supreme Court's holding in *Arizona*. There, the Court reasoned that "[a]lthough § 5(C) attempts to achieve one of the same goals as federal law—the deterrence of unlawful employment—it involves a conflict in the method of enforcement." *Arizona*, 132 S. Ct. at 2505. The Court went on to explain that it had previously "recognized that a '[c]onflict in technique can be fully as disruptive to the system Congress enacted as conflict in overt policy.'" *Id.* (quoting *Motor Coach Employees*, 403 U.S. at 287). Thus, the Court found § 5(C) pre-empted even though the provision imposed sanctions only on conduct already prohibited under federal law.[28]

Furthermore, it must be remembered that the housing provisions are not "concurrent" with federal law, despite Hazleton's argument to the contrary. In addition to interfering with federal removal discretion, the housing provisions conflict with federal law because they define

_____

[28] While we acknowledge that § 5(C) attempted to enact "a state *criminal* prohibition where no federal counterpart exists," *Arizona*, 132 S. Ct. at 2503 (emphasis added), federal law does nonetheless prohibit unauthorized employment and imposes civil penalties on aliens who seek or engage in unauthorized work. *See id.* at 2504 (listing civil penalties imposed on aliens who seek or engage in work without authorization). Thus, § 5(C) is an example of a state's "concurrent enforcement" effort, as that term is defined by the City, which was nonetheless found to be conflict pre-empted by the Supreme Court.

"harboring" to include simple landlord-tenant relationships. Although the Supreme Court has yet to define "harboring" as that term is used in 8 U.S.C. § 1324(a)(1)(A)(iii), we have found that culpability requires some act of concealment from authorities. *See Lozano II*, 620 F.3d at 223. "We . . . define 'harboring' as conduct 'tending to substantially facilitate an alien's remaining in the United States illegally *and to prevent government authorities from detecting the alien's unlawful presence*." *Id.* (quoting *United States v. Ozcelik*, 527 F.3d 88, 100 (3d Cir. 2008) (emphasis added)); *see also United States v. Kim*, 193 F.3d 567, 574 (2d Cir. 1999) (Harboring "encompasses conduct tending substantially to facilitate an alien's remaining in the United States illegally and to prevent government authorities from detecting his unlawful presence."). Renting an apartment in the normal course of business is not, without more, conduct that prevents the government from detecting an alien's unlawful presence. Thus, it is highly unlikely that renting an apartment to an unauthorized alien would be sufficient to constitute harboring in violation of the INA.[29]

The City also argues that *Whiting* held that a verification under 8 U.S.C. § 1373(c) is an accurate assessment of an alien's immigration status and a sufficient basis for state or local action with respect to that alien. The City overlooks, however, that the state or locality must *first* have authority to take the underlying action with respect to an alien. Only then is verification under 8 U.S.C. § 1373(c) relevant to support permissible state or local action. Because the *Whiting* plurality held that Arizona's employer sanctions law was a valid licensing law not pre-empted by IRCA, it followed that a federal verification of immigration status is a proper basis upon which Arizona may impose its licensing

---

[29] *See also Villas at Parkside Partners*, 2013 WL 3791664, at *5 (concluding that, "by criminalizing conduct that does not have the effect of evading federal detection, and by giving state officials authority to act as immigration officers outside the 'limited circumstances' specified by federal law," local housing ordinance conflicts with federal anti-harboring law).

43

sanctions. That is not the case with respect to the housing provisions in Hazleton's ordinances.

As we have explained, the housing provisions are themselves pre-empted. It is therefore irrelevant that they would be imposed pursuant to a valid status verification under § 1373(c). Hazleton simply does not have the legal authority to take that action even if done pursuant to a valid determination of status under federal law. *See Arizona*, 132 S. Ct. at 2505 (explaining why § 5(C) of Arizona's S.B. 1070 law, which attempted to impose sanctions on unauthorized workers, was conflict pre-empted); A.R.S. § 13-2928(E) (providing that "[i]n the enforcement of [§ 5(C)], an alien's immigration status may be determined . . . pursuant to 8 [U.S.C.] § 1373(c)").

For the foregoing reasons, we again hold that the housing provisions conflict with federal law and are thus pre-empted.

3. *The Rental Registration Provisions in the RO Are Field Pre-empted Even When Divorced from the Harboring Provisions in the IIRAO.*

The approach throughout this litigation has been to consider the relevant housing provisions in the RO in conjunction with those in the IIRAO. Nonetheless, it is theoretically possible that the rental registration scheme in the RO may not conflict with federal immigration law if divorced from the harboring provisions and sanctions in the IIRAO.[30]

---

[30] *See Arizona*, 132 S. Ct. at 2508-09 (vacating injunction against § 2(B) of Arizona's S.B. 1070 law because Congress "has encouraged the sharing of information [between federal and state officials] about possible immigration violations" and § 2(B) could be read to avoid constitutional concerns); 8 U.S.C. § 1357(g)(10)(A)-(B) (requiring no formal agreement for state and local authorities to "communicate with the Attorney General regarding the immigration status of any individual" or "otherwise to

44

However, we conclude that the housing provisions in the RO, even if considered separately from the anti-harboring provisions in the IIRAO, are pre-empted because they intrude upon the field occupied by federal alien registration law. [31]

As we have explained, the RO requires those seeking to occupy rental housing to register with the City and obtain an occupancy permit. To obtain an occupancy permit, the applicant need only pay the requisite registration fee and submit the name and address of the prospective occupant, the name of the landlord, the address of the rental unit, and "proof of legal citizenship and/or residency." RO § 7b. As the City itself points out, under the terms of the RO alone, all applicants are issued an occupancy permit upon providing the required information and the requisite fee—even if the applicant indicates that she lacks legal status. Those who occupy rental housing without complying with this registration scheme are subject to fines of $100 to $300, or imprisonment for up to 90 days in default of payment. RO § 10a. Thus, the rental registration scheme of the RO standing alone operates as a requirement that a subset of Hazleton's population—those residing in rental housing—register their immigration status with the City.

---

cooperate with the Attorney General in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States").

[31] We previously concluded that "[t]he sole severability issue Hazleton has not waived concerns the IIRAO's private cause of action." *Lozano II*, 620 F.3d at 182. As we explained in *supra* note 5, that holding is not at issue here. However, we acknowledge that our prior severability holding may not necessarily foreclose a decision to uphold the RO, and the rental registration scheme, if considered separately from the related anti-harboring provisions in the IIRAO. Indeed, those provisions appear in *separate statutes*. This does not impact the outcome here, however, because, as we explain below, the rental registration scheme in the RO is itself field pre-empted.

45

It is beyond dispute that states and localities may not intrude in the field of alien registration. *Arizona*, 132 S. Ct. at 2502 (reiterating holding in *Hines*, 312 U.S. at 70, that "the Federal Government has occupied the field of alien registration"). Thus, in *Arizona*, the Supreme Court found pre-empted § 3 of Arizona's S.B. 1070 law, which forbade "willful failure to complete or carry an alien registration document" in violation of federal law. *Arizona*, 132 S. Ct. 2501. Hazleton's rental registration scheme similarly intrudes into the field of alien registration. One of the rental registration scheme's primary functions is to require rental housing occupants to report their immigration status to the City of Hazleton and penalize the failure to register and obtain an occupancy permit pursuant to that requirement. This attempt to create a local alien registration requirement is field pre-empted.

In arguing that the RO is nothing like an alien registration system, the City claims "the most notable difference" is that the RO applies equally to citizens and aliens alike while the federal Alien Registration Act applies only to noncitizens.[32] We are not persuaded. It is highly unlikely that the local registration laws invalidated on field pre-emption grounds in *Hines* or *Arizona* would have been upheld if they applied to citizens and aliens alike. The RO's registration scheme cannot avoid pre-emption merely because it requires both citizens and noncitizens to declare their immigration status.[33] The City also argues that a finding that

---

[32] The Court of Appeals for the Eighth Circuit adopted this argument and concluded that a similar rental registration scheme is not field pre-empted. *See Keller*, 2013 WL 3242111, at *6 ("The occupancy license scheme at issue is nothing like the state registration laws invalidated in *Hines* and in *Arizona* [because it] requires *all* renters, including U.S. citizens and nationals, to obtain an occupancy license. . . . ).

[33] Indeed, Hazleton's requirement that citizens, in addition to non-citizens, register their immigration status is an even worse transgression into the field of alien registration law as it imposes burdens on U.S. citizens that are absent from federal law. Since Congress has not seen fit to require

46

the RO constitutes an alien registration system is implausible because it would require the invalidation of laws limiting drivers' licenses to lawfully present aliens. This argument is also unpersuasive. Basing eligibility for certain state privileges on immigration status is distinct from requiring aliens to register. The RO's rental registration scheme serves no discernible purpose other than to register the immigration status of a subset of the City's population. It can only be viewed as an impermissible alien registration requirement.[34]

## IV.  Conclusion

For the reasons set forth above, we conclude that the employment provisions in the IIRAO are distinguishable from the Arizona law upheld in *Whiting*, and the Supreme Court's reasoning in *Whiting* and *Arizona* does not otherwise undermine our conclusion that both the employment and housing provisions in the IIRAO and RO are pre-empted by federal law. Accordingly, we will again affirm in part and reverse in part the District Court's order permanently enjoining Hazleton's enforcement of the IIRAO and RO.

## V.  Appendix

### A.    The Illegal Immigration Relief Act Ordinance (Ordinance 2006-18, as amended by Ordinances 2006-40 and 2007-7)

---

U.S. citizens to prove their citizenship status before obtaining rental housing, we are at a loss to understand Hazleton's argument that imposing this burden on citizens saves the RO's registration scheme from pre-emption.

[34] The RO is also distinguishable from § 2(B) of Arizona's S.B. 1070, which the Supreme Court did not enjoin in *Arizona*. Section 2(B), unlike the rental registration scheme in the RO, did not impose any registration obligation on aliens. Rather, § 2(B) imposed only an obligation on local police to verify the immigration status of persons stopped, detained or arrested. *Arizona*, 132 S. Ct. at 2507-10.

ILLEGAL IMMIGRATION RELIEF ACT ORDINANCE
BE IT ORDAINED BY THE COUNCIL OF THE CITY OF
HAZLETON AS FOLLOWS:

SECTION 1. TITLE
This chapter shall be known and may be cited as the "City of Hazleton Illegal Immigration Relief Act Ordinance."

SECTION 2. FINDINGS AND DECLARATION OF PURPOSE

The People of the City of Hazleton find and declare:

A. That state and federal law require that certain conditions be met before a person may be authorized to work or reside in this country.

B. That unlawful workers and illegal aliens, as defined by this ordinance and state and federal law, do not normally meet such conditions as a matter of law when present in the City of Hazleton.

C. That unlawful employment, the harboring of illegal aliens in dwelling units in the City of Hazleton, and crime committed by illegal aliens harm the health, safety and welfare of authorized U.S. workers and legal residents in the City of Hazleton. Illegal immigration leads to higher crime rates, subjects our hospitals to fiscal hardship and legal residents to substandard quality of care, contributes to other burdens on public services, increasing their cost and diminishing their availability to legal residents, and diminishes our overall quality of life.

D. That the City of Hazleton is authorized to abate public nuisances and empowered and mandated by the people of Hazleton to abate the nuisance of illegal immigration by diligently prohibiting the acts and policies that facilitate illegal immigration in a manner consistent with federal law and the objectives of Congress.

E. That United States Code Title 8, subsection 1324(a)(1)(A)

prohibits the harboring of illegal aliens. The provision of housing to illegal aliens is a fundamental component of harboring.

F. This ordinance seeks to secure to those lawfully present in the United States and this City, whether or not they are citizens of the United States, the right to live in peace free of the threat crime, to enjoy the public services provided by this city without being burdened by the cost of providing goods, support and services to aliens unlawfully present in the United States, and to be free of the debilitating effects on their economic and social well being imposed by the influx of illegal aliens to the fullest extent that these goals can be achieved consistent with the Constitution and Laws of the United States and the Commonwealth of Pennsylvania.

G. The City shall not construe this ordinance to prohibit the rendering of emergency medical care, emergency assistance, or legal assistance to any person.

SECTION 3. DEFINITIONS

When used in this chapter, the following words, terms and phrases shall have the meanings ascribed to them herein, and shall be construed so as to be consistent
with state and federal law, including federal immigration law:

A. "Business entity" means any person or group of persons performing or engaging in any activity, enterprise, profession, or occupation for gain, benefit, advantage, or livelihood, whether for profit or not for profit.

> (1) The term business entity shall include but not be limited to selfemployed individuals, partnerships, corporations, contractors, and subcontractors.
> (2) The term business entity shall include any business entity that possesses a business permit, any business entity that is exempt by law from obtaining such a business permit, and any business entity that is operating unlawfully without such a business permit.

B. "City" means the City of Hazleton.

C. "Contractor" means a person, employer, subcontractor or business entity that enters into an agreement to perform any service or work or to provide a certain product in exchange for valuable consideration. This definition shall include but not be limited to a subcontractor, contract employee, or a recruiting or staffing entity.

D. "Illegal Alien" means an alien who is not lawfully present in the United States, according to the terms of United States Code Title 8, section 1101 et seq. The City shall not conclude that a person is an illegal alien unless and until an authorized representative of the City has verified with the federal government, pursuant to United States Code Title 8, subsection 1373(c), that the person is an alien who is not lawfully present in the United States.

E. "Unlawful worker" means a person who does not have the legal right or authorization to work due to an impediment in any provision of federal, state or local law, including but not limited to a minor disqualified by nonage, or an unauthorized alien as defined by United States Code Title 8, subsection 1324a(h)(3).

F. "Work" means any job, task, employment, labor, personal services, or any other activity for which compensation is provided, expected, or due, including but not limited to all activities conducted by business entities.

G. "Basic Pilot Program" means the electronic verification of work authorization program of the Illegal Immigration Reform and Immigration Responsibility Act of 1996, P.L. 104-208, Division C, Section 403(a); United States Code Title 8, subsection 1324a, and operated by the United States Department of Homeland Security (or a successor program established by the federal government.)

SECTION 4. BUSINESS PERMITS, CONTRACTS, OR GRANTS

50

A. It is unlawful for any business entity to knowingly recruit, hire for employment, or continue to employ, or to permit, dispatch, or instruct any person who is an unlawful worker to perform work in whole or part within the City. Every business entity that applies for a business permit to engage in any type of work in the City shall sign an affidavit, prepared by the City Solicitor, affirming that they do not knowingly utilize the services or hire any person who is an unlawful worker.

B. Enforcement: The Hazleton Code Enforcement Office shall enforce the requirements of this section.

(1) An enforcement action shall be initiated by means of a written signed complaint to the Hazleton Code Enforcement Office submitted by any City official, business entity, or City resident. A valid complaint shall include an allegation which describes the alleged violator(s) as well as the actions constituting the violation, and the date and location where such actions occurred.
(2) A complaint which alleges a violation on the basis of national origin, ethnicity, or race shall be deemed invalid and shall not be enforced.
(3) Upon receipt of a valid complaint, the Hazleton Code Enforcement Office shall, within three business days, request identity information from the business entity regarding any persons alleged to be unlawful workers. The Hazleton Code Enforcement Office shall suspend the business permit of any business entity which fails, within three business days after receipt of the request, to provide such information. In instances where an unlawful worker is alleged to be an unauthorized alien, as defined in United States Code Title 8, subsection 1324a(h)(3), the Hazleton Code Enforcement Office shall submit identity data required by the federal government to verify, pursuant to United States Code Title 8, section 1373, the immigration status of such person(s), and shall provide the business entity with written confirmation of that verification.
(4) The Hazleton Code Enforcement Office shall suspend the business permit of any business entity which fails correct a violation of this section within three business days after notification of the violation by the Hazleton

51

Code Enforcement Office.

(5) The Hazleton Code Enforcement Office shall not suspend the business permit of a business entity if, prior to the date of the violation, the business entity had verified the work authorization of the alleged unlawful worker(s) using the Basic Pilot Program.

(6) The suspension shall terminate one business day after a legal representative of the business entity submits, at a City office designated by the City Solicitor, a sworn affidavit stating that the violation has ended.

> (a) The affidavit shall include a description of the specific measures and actions taken by the business entity to end the violation, and shall include the name, address and other adequate identifying information of the unlawful workers related to the complaint.

> (b) Where two or more of the unlawful workers were verified by the federal government to be unauthorized aliens, the legal representative of the business entity shall submit to the Hazleton Code Enforcement Office, in addition to the prescribed affidavit, documentation acceptable to the City Solicitor which confirms that the business entity has enrolled in and will participate in the Basic Pilot Program for the duration of the validity of the business permit granted to the business entity.

(7) For a second or subsequent violation, the Hazleton Code Enforcement Office shall suspend the business permit of a business entity for a period of twenty days. After the end of the suspension period, and upon receipt of the prescribed affidavit, the Hazleton Code Enforcement Office shall reinstate the business permit. The Hazleton Code Enforcement Office shall forward the affidavit, complaint, and associated documents to the appropriate federal enforcement agency, pursuant to United States Code Title 8, section 1373. In the case of an unlawful worker disqualified by state law not related to immigration, the Hazleton Code Enforcement Office shall forward the affidavit, complaint, and associated documents to the appropriate state enforcement agency.

C. All agencies of the City shall enroll and participate in the Basic Pilot Program.

D. As a condition for the award of any City contract or grant to a business entity for which the value of employment, labor or, personal services shall exceed $10,000, the business entity shall provide documentation confirming its enrollment and participation in the Basic Pilot Program.

E. Private Cause of Action for Unfairly Discharged Employees

(1) The discharge of any employee who is not an unlawful worker by a business entity in the City is an unfair business practice if, on the date of the discharge, the business entity was not participating in the Basic Pilot program and the business entity was employing an unlawful worker.

(2) The discharged worker shall have a private cause of action in the Municipal Court of Hazleton against the business entity for the unfair business practice. The business entity found to have violated this subsection shall be liable to the aggrieved employee for:

(a) three times the actual damages sustained by the employee, including but not limited to lost wages or compensation from the date of the discharge until the date the employee has procured new employment at an equivalent rate of compensation, up to a period of one hundred and twenty days; and

(b) reasonable attorney's fees and costs.

SECTION 5. HARBORING ILLEGAL ALIENS

A. It is unlawful for any person or business entity that owns a dwelling unit in the City to harbor an illegal alien in the dwelling unit, knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, unless such harboring is otherwise expressly permitted by federal law.

(1) For the purposes of this section, to let, lease, or rent a dwelling unit to an illegal alien, knowing or in reckless disregard of the fact that an alien has come to, entered, or

53

remains in the United States in violation of law, shall be deemed to constitute harboring. To suffer or permit the occupancy of the dwelling unit by an illegal alien, knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, shall also be deemed to constitute harboring.

(2) A separate violation shall be deemed to have been committed on each day that such harboring occurs, and for each adult illegal alien harbored in the dwelling unit, beginning one business day after receipt of a notice of violation from the Hazleton Code Enforcement Office.

(3) A separate violation of this section shall be deemed to have been committed for each business day on which the owner fails to provide the Hazleton Code Enforcement Office with identity data needed to obtain a federal verification of immigration status, beginning three days after the owner receives written notice from the Hazleton Code Enforcement Office.

B. Enforcement: The Hazleton Code Enforcement Office shall enforce the requirements of this section.

(1) An enforcement action shall be initiated by means of a written signed complaint to the Hazleton Code Enforcement Office submitted by any official, business entity, or resident of the City. A valid complaint shall include an allegation which describes the alleged violator(s) as well as the actions constituting the violation, and the date and location where such actions occurred.

(2) A complaint which alleges a violation on the basis of national origin, ethnicity, or race shall be deemed invalid and shall not be enforced.

(3) Upon receipt of a valid written complaint, the Hazleton Code Enforcement Office shall, pursuant to United States Code Title 8, section 1373(c), verify with the federal government the immigration status of a person seeking to use, occupy, lease, or rent a dwelling unit in the City. The Hazleton Code Enforcement Office shall submit identity data required by the federal government to verify immigration status. The City shall forward identity data

54

provided by the owner to the federal government, and shall provide the property owner with written confirmation of that verification.

(4) If after five business days following receipt of written notice from the City that a violation has occurred and that the immigration status of any alleged illegal alien has been verified, pursuant to United States Code Title 8, section 1373(c), the owner of the dwelling unit fails to correct a violation of this section, the Hazleton Code Enforcement Office shall deny or suspend the rental license of the dwelling unit.

(5) For the period of suspension, the owner of the dwelling unit shall not be permitted to collect any rent, payment, fee, or any other form of compensation from, or on behalf of, any tenant or occupant in the dwelling unit.

(6) The denial or suspension shall terminate one business day after a legal representative of the dwelling unit owner submits to the Hazleton Code Enforcement Office a sworn affidavit stating that each and every violation has ended. The affidavit shall include a description of the specific measures and actions taken by the business entity to end the violation, and shall include the name, address and other adequate identifying information for the illegal aliens who were the subject of the complaint.

(7) The Hazleton Code Enforcement Office shall forward the affidavit, complaint, and associated documents to the appropriate federal enforcement agency, pursuant to United States Code Title 8, section 1373.

(8) Any dwelling unit owner who commits a second or subsequent violation of this section shall be subject to a fine of two hundred and fifty dollars ($250) for each separate violation. The suspension provisions of this section applicable to a first violation shall also apply.

(9) Upon the request of a dwelling unit owner, the Hazleton Code Enforcement Office shall, pursuant to United States Code Title 8, section 1373(c), verify with the federal government the lawful immigration status of a person seeking to use, occupy, lease, or rent a dwelling unit in the City. The penalties in this section shall not apply in the case of dwelling unit occupants whose status as an alien lawfully present in the United States has been

verified.

## SECTION 6. CONSTRUCTION AND SEVERABILITY

A. The requirements and obligations of this section shall be implemented in a manner fully consistent with federal law regulating immigration and protecting the civil rights of all citizens and aliens.

B. If any part of provision of this Chapter is in conflict or inconsistent with applicable provisions of federal or state statutes, or is otherwise held to be invalid or unenforceable by any court of competent jurisdiction, such part of provision shall be suspended and superseded by such applicable laws or regulations, and the remainder of this Chapter shall not be affected thereby.

## SECTION 7. IMPLEMENTATION AND PROCESS

A. *Prospective Application Only*. The default presumption with respect to Ordinances of the City of Hazleton—that such Ordinances shall apply only prospectively—shall pertain to the Illegal Immigration Relief Act Ordinance. The Illegal Immigration Relief Act Ordinance shall be applied only to employment contracts, agreements to perform service or work, and agreements to provide a certain product in exchange for valuable consideration that are entered into or are renewed after the date that the Illegal Immigration Relief Act Ordinance becomes effective and any judicial injunction prohibiting its implementation is removed. The Illegal Immigration Relief Act Ordinance shall be applied only to contracts to let, lease, or rent dwelling units that are entered into or are renewed after the date that the Illegal Immigration Relief Act Ordinance becomes effective and any judicial injunction prohibiting its implementation is removed. The renewal of a month-to-month lease or other type of tenancy which automatically renews absent notice by either party will not be considered as entering into a new contract to let, lease or rent a dwelling unit.

B. *Condition of Lease*. Consistent with the obligations of a

rental unit owner described in Section 5.A., a tenant may not enter into a contract for the rental or leasing of a dwelling unit unless the tenant is either a U.S. citizen or an alien lawfully present in the United States according to the terms of United States Code Title 8, Section 1101 et seq. A tenant who is neither a U.S. citizen nor an alien lawfully present in the United States who enters into such a contract shall be deemed to have breached a condition of the lease under 68 P.S. Section 250.501. A tenant who is not a U.S. citizen who subsequent to the beginning of his tenancy becomes unlawfully present in the United States shall be deemed to have breached a condition of the lease under 68 P.S. Section 250.501.

C. *Corrections of Violations—Employment of Unlawful Workers*. The correction of a violation with respect to the employment of an unlawful worker shall include any of the following actions:

(1) The business entity terminates the unlawful worker's employment.

(2) The business entity, after acquiring additional information from the worker, requests a secondary or additional verification by the federal government of the worker's authorization, pursuant to the procedures of the Basic Pilot Program. While this verification is pending, the three business day period described in Section 4.B.(4) shall be tolled.

(3) The business entity attempts to terminate the unlawful worker's employment and such termination is challenged in a court of the Commonwealth of Pennsylvania. While the business entity pursues the termination of the unlawful worker's employment in such forum, the three business day period described in Section 4.B.(4) shall be tolled.

D. *Corrections of Violations—Harboring Illegal Aliens*. The correction of a violation with respect to the harboring of an illegal alien in a dwelling unit shall include any of the following actions:

(1) A notice to quit, in writing, issued and served by the

dwelling unit owner, as landlord, to the tenant declaring a forfeiture of the lease for breach of the lease condition describe in Section 7.B.

(2) The dwelling unit owner, after acquiring additional information from the alien, requests the City of Hazleton to obtain a secondary or additional verification by the federal government that the alien is lawfully present in the United States, under the procedures designated by the federal government, pursuant to United States Code Title 8, Subsection 1373(c). While this second verification is pending, the five business day period described in Section 5.B.(4) shall be tolled.

(3) The commencement of an action for the recovery of possession of real property in accordance with Pennsylvania law by the landlord against the illegal alien. If such action is contested by the tenant in court, the dwelling unit owner shall be deemed to have complied with this Ordinance while the dwelling unit owner is pursuing the action in court. While this process is pending, the five business day period described in Section 5.B.(4) shall be tolled.

E. *Procedure if Verification is Delayed*. If the federal government notifies the City of Hazleton that it is unable to verify whether a tenant is lawfully present in the United States or whether an employee is authorized to work in the United States, the City of Hazleton shall take no further action on the complaint until a verification from the federal government concerning the status of the individual is received. At no point shall any City official attempt to make an independent determination of any alien's legal status, without verification from the federal government, pursuant to United States Code Title 8, Subsection 1373(c).

F. *Venue for Judicial Process*. Any business entity or rental unit owner subject to a complaint and subsequent enforcement under this ordinance, or any employee of such a business entity or tenant of such a rental unit owner, may challenge the enforcement of this Ordinance with respect to such entity or individual in the Magisterial District Court for the City of Hazleton, subject to the right of appeal to the

Luzerne County Court of Common Pleas. Such an entity or individual may alternatively challenge the enforcement of this Ordinance with respect to such entity or individual in any other court of competent jurisdiction in accordance with applicable law, subject to all rights of appeal.

G. *Deference to Federal Determinations of Status*. The determination of whether a tenant of a dwelling is lawfully present in the United States, and the determination of whether a worker is an unauthorized alien shall be made by the federal government, pursuant to United States Code Title 8, Subsection 1373(c). A determination of such status of an individual by the federal government shall create a rebuttable presumption as to that individual's status in any judicial proceedings brought pursuant to this ordinance. The Court may take judicial notice of any verification of the individual previously provided by the federal government and may request the federal government to provide automated or testimonial verification pursuant to United States Code Title 8, Subsection 1373(c).

## B. Rental Registration Ordinance (Ordinance 2006-13)

ESTABLISHING A REGISTRATION PROGRAM FOR RESIDENTIAL RENTAL PROPERTIES; REQUIRING ALL OWNERS OF RESIDENTIAL RENTAL PROPERTIES TO DESIGNATE AN AGENT FOR SERVICE OF PROCESS; AND PRESCRIBING DUTIES OF OWNERS, AGENTS AND OCCUPANTS; DIRECTING THE DESIGNATION OF AGENTS; ESTABLISHING FEES FOR THE COSTS ASSOCIATED WITH THE REGISTRATION OF RENTAL PROPERTY; AND PRESCRIBING PENALTIES FOR VIOLATIONS BE IT ORDAINED BY THE GOVERNING BODY OF THE CITY OF HAZLETON AND IT IS HEREBY ORDAINED AND WITH THE AUTHORITY OF THE SAME AS FOLLOWS:

SECTION 1. DEFINITIONS AND INTERPRETATION.

The following words, when used in this ordinance, shall have

the meanings ascribed to them in this section, except in those instances where the context clearly indicates otherwise. When not inconsistent with the context, words used in the present tense include the future; words in the plural number include the singular number; words in the singular shall include the plural, and words in the masculine shall include the feminine and the neuter.

a. AGENT—Individual of legal majority who has been designated by the Owner as the agent of the Owner or manager of the Property under the provisions of this ordinance.

b. CITY—City of Hazleton

c. CITY CODE—the building code (property Maintenance Code 1996 as amended or superceded) officially adopted by the governing body of the City, or other such codes officially designated by the governing body of the City for the regulation of construction, alteration, addition, repair, removal, demolition, location, occupancy and maintenance of buildings and structures.

d. ZONING ORDINANCE—Zoning ordinance as officially adopted by the City of Hazleton, File of Council # 95-26 (as amended).

e. OFFICE—The Office of Code Enforcement for the City of Hazleton.

f. DWELLING UNIT—a single habitable unit, providing living facilities for one or more persons, including permanent space for living, sleeping, eating, cooking and bathing and sanitation, whether furnished or unfurnished. There may be more than one Dwelling Unit on a Premises.

g. DORMITORY—a residence hall offered as student or faculty housing to accommodate a college or university, providing living or sleeping rooms for individuals or groups of individuals, with or without cooking facilities and with or without private baths.

h. INSPECTOR—any person authorized by Law or Ordinance to inspect buildings or systems, e.g. zoning, housing, plumbing, electrical systems, heat systems, mechanical systems and health necessary to operate or use buildings within the City of Hazleton. An Inspector would include those identified in Section 8—Enforcement.

i. FIRE DEPARTMENT—the Fire Department of the City of Hazleton or any member thereof, and includes the Chief of Fire or his designee.

j. HOTEL—a building or part of a building in which living and sleeping accommodations are used primarily for transient occupancy, may be rented on a daily basis, and desk service is provided, in addition to one or more of the following services: maid, telephone, bellhop service, or the furnishing or laundering of linens.

k. LET FOR OCCUPANCY—to permit, provide or offer, for consideration, possession or occupancy of a building, dwelling unit, rooming unit, premise or structure by a person who is not the legal owner of record thereof, pursuant to a written or unwritten lease, agreement or license, or pursuant to a recorded or unrecorded agreement or contract for the sale of land.

*l.* MOTEL—a building or group of buildings which contain living and sleeping accommodations used primarily for transient occupancy, may be rented on a daily basis, and desk service is provided, and has individual entrances from outside the building to serve each such living or sleeping unit.

m. OCCUPANT—a person age 18 or older who resides at a Premises.

n. OPERATOR—any person who has charge, care or control of a Premises which is offered or let for occupancy.

*o.* OWNER—any Person, Agent, or Operator having a legal or equitable interest in the property; or recorded in the official

61

records of the state, county, or municipality as holding title to the property; or otherwise having control of the property, including the guardian of the estate of any such person, and the executor or administrator of the estate of such person if ordered to take possession of real property by a Court of competent jurisdiction.

p. OWNER-OCCUPANT—an owner who resides in a Dwelling Unit on a regular permanent basis, or who otherwise occupies a nonresidential portion of the Premises on a regular permanent basis.

q. PERSON—any person, partnership, firm, association, corporation, or municipal authority or any other group acting as a single unit.

r. POLICE DEPARTMENT—the Police Department of the City of Hazleton or any member thereof sworn to enforce laws and ordinances in the City, and includes the Chief of Police or his designee.

s. PREMISES—any parcel of real property in the City, including the land and all buildings and structures in which one or more Rental Units are located.

t. RENTAL UNIT—means a Dwelling Unit or Rooming Unit which is Let for Occupancy and is occupied by one or more Tenants.

u. ROOMING UNIT—any room or groups of rooms forming a single habitable unit occupied or intended to be occupied for sleeping or living, but not for cooking purposes.

v. TENANT—any Person authorized by the Owner or Agent who occupies a Rental Unit within a Premises regardless of whether such Person has executed a lease for said Premises.

SECTION 2. APPOINTMENT OF AN AGENT AND/OR MANAGER

Each Owner who is not an Owner-occupant, or who does not

reside in the City of Hazleton or within a ten (10) mile air radius of the City limits, shall appoint an Agent who shall reside in the City or within a ten (10) mile air radius of the City limits.

SECTION 3. DUTIES OF THE OWNER AND/OR AGENT

a. The Owner has the duty to maintain the Premises in good repair, clean and sanitary condition, and to maintain the Premises in compliance with the current Codes, Building Codes and Zoning Ordinance of the City of Hazleton. The Owner may delegate implementation of these responsibilities to an Agent.

b. The duties of the Owner and/or Agent shall be to receive notices and correspondence, including service of process, from the City of Hazleton; to arrange for the inspection of the Rental Units; do or arrange for the performance of maintenance, cleaning, repair, pest control, snow and ice removal, and ensure continued compliance of the Premises with the current Codes, Building Codes and Zoning Ordinance in effect in the City of Hazleton, as well as arrange for garbage removal.

c. The name, address and telephone number of the Owner and Agent, if applicable, shall be reported to the Code Enforcement Office in writing upon registering the Rental Units.

d. No Dwelling Unit shall be occupied, knowingly by the Owner or Agent, by a number of persons that is in excess of the requirements outlined in 2003 International Property Maintenance Code, Chapter 4, Light, Ventilation, and Occupancy Limits, Section PM-404.5, Overcrowding, or any update thereof, a copy of which is appended hereto and made a part hereof.

SECTION 4. NOTICES

a. Whenever an Inspector or Code Enforcement Officer determines that any Rental Unit or Premises fails to meet the

requirements set forth in the applicable Codes, the Inspector or Code Enforcement Officer shall issue a correction notice setting forth the violations and ordering the Occupant, Owner or Agent, as appropriate, to correct such violations. The notice shall:

1) Be in writing;
2) Describe the location and nature of the violation;
3) Establish a reasonable time for the correction of the violation.

b. All notices shall be served upon the Occupant, Owner or Agent, as applicable, personally or by certified mail, return receipt requested. A copy of any notices served solely on an Occupant shall also be provided to the Owner or Agent. In the event service is first attempted by mail and the notice is returned by the postal authorities marked "unclaimed" or "refused", then the Code Enforcement Office or Police Department shall attempt delivery by personal service on the Occupant, Owner or Agent, as applicable. The Code Enforcement Office shall also post the notice at a conspicuous place on the Premises. If personal service directed to the Owner or Agent cannot be accomplished after a reasonable attempt to do so, then the notice may be sent to the Owner or Agent, as applicable, at the address stated on the most current registration application for the Premises in question, by regular first class mail, postage prepaid. If such notice is not returned by the postal authorities within five (5) days of its deposit in the U.S. Mail, then it shall be deemed to have been delivered to and received by the addressee on the fifth day following its deposit in the United States Mail.

c. For purposes of this Ordinance, any notice hereunder that is given to the Agent shall be deemed as notice given to the Owner.

d. There shall be a rebuttable presumption that any notice that is given to the Occupant, Owner or Agent under this ordinance shall have been received by such Occupant, Owner or Agent if the notice was served in the manner provided by this ordinance.

e. Subject to paragraph 4.d above, a claimed lack of knowledge by the Owner or Agent, if applicable, of any violation hereunder cited shall be no defense to closure of rental units pursuant to Section 9, as long as all notices prerequisite to such proceedings have been given and deemed received in accordance with the provisions of this ordinance.

f. All notices shall contain a reasonable time to correct, or take steps to correct, violations of the above. The Occupant, Owner or Agent to whom the notice was addressed may request additional time to correct violations. Requests for additional time must be in writing and either deposited in the U.S. Mail (post-marked) or handdelivered to the Code Enforcement Office within five (5) days of receipt of the notice by the Occupant, Owner or Agent. The City retains the right to deny or modify time extension requests. If the Occupant, Owner or Agent is attempting in good faith to correct violations but is unable to do so within the time specified in the notice, the Occupant, Owner or Agent shall have the right to request such additional time as may be needed to complete the correction work, which request shall not be unreasonably withheld.

g. Failure to correct violations within the time period stated in the notice of violation shall result in such actions or penalties as are set forth in Section 10 of this ordinance. If the notice of violation relates to actions or omissions of the Occupant, and the Occupant fails to make the necessary correction, the Owner or Agent may be required to remedy the condition. No adverse action shall be taken against an Owner or Agent for failure to remedy a condition so long as the Owner or Agent is acting with due diligence and taking bona fide steps to correct the violation, including but not limited to pursuing remedies under a lease agreement with an Occupant or Tenant. The City shall not be precluded from pursuing an enforcement action against any Occupant or Tenant who is deemed to be in violation.

SECTION 5. INSURANCE

In order to protect the health, safety and welfare of the residents of the City, it is hereby declared that the city shall require hazard and general liability insurance for all property owners letting property for occupancy in the City.

a. Minimum coverage; use of insurance proceeds. All Owners shall be required to obtain a minimum of fifty thousand ($50,000.00) dollars in general liability insurance, and hazard and casualty insurance in an amount sufficient to either restore or remove the building in the event of a fire or other casualty. Further, in the event of any fire or loss covered by such insurance, it shall be the obligation of the Owner to use such insurance proceeds to cause the restoration or demolition or other repair of the property in adherence to the City Code and all applicable ordinances.

b. Property owners to provide City with insurance information. Owners shall be required to place their insurance company name, policy number and policy expiration date on their Rental Property Registration form, or in the alternative, to provide the Code Enforcement Office with a copy of a certificate of insurance. A registration Certificate (see Section 6 below) shall not be issued to any Owner or Agent unless the aforementioned information has been provided to the Code Enforcement Office. The Code Enforcement Office shall be informed of any change in policies for a particular rental property or cancellation of a policy for said property within thirty (30) days of said change or cancellation.

SECTION 6. RENTAL REGISTRATION AND LICENSE REQUIREMENTS

a. No Person shall hereafter occupy, allow to be occupied, advertise for occupancy, solicit occupants for, or let to another person for occupancy any Rental Unit within the City for which an application for license has not been made and filed with the Code Enforcement Office and for which there is not an effective license. Initial application and renewal shall be made upon forms furnished by the Code Enforcement Office for such purpose and shall specifically require the following minimum information:

1) Name, mailing address, street address and phone number of the Owner, and if the Owner is not a natural person, the name, address and phone number of a designated representative of the Owner.

2) Name, mailing address, street address and phone number of the Agent of the Owner, if applicable.

3) The street address of the Premises being registered.

4) The number and types of units within the Premises (Dwelling Units or Rooming Units) The Owner or Agent shall notify the Code Enforcement Office of any changes of the above information within thirty (30) days of such change.

b. The initial application for registration and licensing shall be made by personally filing an application with the Code Enforcement Office by November 1, 2006. Thereafter, any new applicant shall file an application before the Premises is let for occupancy, or within thirty (30) days of becoming an Owner of a currently registered Premises. One application per property is required, as each property will receive its own license.

c. Upon receipt of the initial application or any renewal thereof and the payment of applicable fees as set forth in Section 7 below, the Code Enforcement Office shall issue a Rental Registration License to the Owner within thirty (30) days of receipt of payment.

d. Each new license issued hereunder, and each renewal license, shall expire on October 31 of each year. The Code Enforcement Office shall mail license renewal applications to the Owner or designated Agent on or before September 1 of each year. Renewal applications and fees may be returned by mail or in person to the Code Enforcement Office. A renewal license will not be issued unless the application and appropriate fee has been remitted.

SECTION 7. FEES.

a. Annual License Fee. There shall be a license fee for the

initial license and an annual renewal fee thereafter. Fees shall be assessed against and payable by the Owner in the amount of $5.00 per Rental Unit, payable at the time of initial registration and annual renewal, as more specifically set forth in Section 6 above.

b. Occupancy Permit Fee. There shall be a one-time occupancy permit fee of $10.00 for every new Occupant, which is payable by the Occupant. For purposes of initial registration under this ordinance, this fee shall be paid for all current Occupants by November 1, 2006. Thereafter, prior to occupying any Rental Unit, all Occupants shall obtain an occupancy permit. It shall be the Occupant's responsibility to submit an occupancy permit application to the Code Enforcement Office, pay the fee and obtain the occupancy permit. If there are multiple Occupants in a single Rental Unit, each Occupant shall obtain his or her own permit. Owner or Agent shall notify all prospective Occupants of this requirement and shall not permit occupancy of a Rental Unit unless the Occupant first obtains an occupancy permit. Each occupancy permit issued is valid only for the Occupant for as long as the Occupant continues to occupy the Rental Unit for which such permit was applied. Any relocation to a different Rental Unit requires a new occupancy permit. All Occupants age 65 and older, with adequate proof of age, shall be exempt from paying the permit fee, but shall be otherwise required to comply with this section and the rest of the Ordinance.

1. Application for occupancy permits shall be made upon forms furnished by the Code Enforcement Office for such purpose and shall specifically require the following minimum information:
a) Name of Occupant
b) Mailing address of Occupant
c) Street address of Rental Unit for which Occupant is applying, if different from mailing address
d) Name of Landlord
e) Date of lease commencement
f) Proof of age if claiming exemption from the permit fee
g) Proper identification showing proof of legal

citizenship and/or residency

2. Upon receipt of the application and the payment of applicable fees as set forth above, the Code Enforcement Office shall issue an Occupancy Permit to the Occupant immediately.

SECTION 8. ENFORCEMENT

a. The following persons are hereby authorized to enforce this Ordinance:

1. The Chief of Police
2. Any Police Officer
3. Code Enforcement Officer
4. The Fire Chief
5. Deputy Fire Chief of the City of Hazleton.
6. Health Officer
7. Director of Public Works

b. The designation of any person to enforce this Ordinance or authorization of an Inspector, when in writing, and signed by a person authorized by Section 8.a to designate or authorize an Inspector to enforce this Ordinance, shall be prima facie evidence of such authority before the Magisterial District Judge, Court of Common Pleas, or any other Court, administrative body of the City, or of this commonwealth, and the designating Director or Supervisor need not be called as a witness thereto.

SECTION 9. FAILURE TO CORRECT VIOLATIONS.

If any Person shall fail, refuse or neglect to comply with a notice of violation as set forth in Section 4 above, the City shall have the right to file an enforcement action with the Magisterial District Judge against any Person the City deems to be in violation. If, after hearing, the Magisterial District Judge determines that such Person or Persons are in violation, the Magisterial District Judge may, at the City's request, order the closure of the Rental Unit(s), or assess fines in accordance with Section 10 below, until such violations are corrected. Such order shall be stayed pending any appeal to

the Court of Common Pleas of Luzerne County.

SECTION 10. FAILURE TO COMPLY WITH THIS ORDINANCE; PENALTIES

a. Except as provided in subsections 10.b and 10.c below, any Person who shall violate any provision of the Ordinance shall, upon conviction thereof after notice and a hearing before the Magisterial District Judge, be sentenced to pay a fine of not less than $100.00 and not more than $300.00 plus costs, or imprisonment for a term not to exceed ninety (90) days in default of payment. Every day that a violation of this Ordinance continues shall constitute a separate offense, provided, however, that failure to register or renew or pay appropriate fees in a timely manner shall not constitute a continuing offense but shall be a single offense not subject to daily fines.

b. Any Owner or Agent who shall allow any Occupant to occupy a Rental Unit without first obtaining an occupancy permit is in violation of Section 7.b and shall, upon conviction thereof after notice and a hearing before the Magisterial District Judge, be sentenced to pay a fine of $1,000 for each Occupant that does not have an occupancy permit and $100 per Occupant per day for each day that Owner or Agent continues to allow each such Occupant to occupy the Rental Unit without an occupancy permit after Owner or Agent is given notice of such violation pursuant to Section 4 above. Owner or Agent shall not be held liable for the actions of Occupants who allow additional occupancy in any Rental Unit without the Owner or Agent's written permission, provided that Owner or Agent takes reasonable steps to remove or register such unauthorized Occupant(s) within ten (10) days of learning of their unauthorized occupancy in the Rental Unit.

c. Any Occupant having an occupancy permit but who allows additional occupancy in a Rental Unit without first obtaining the written permission of the Owner or Agent and without requiring each such additional Occupant to obtain his or her own occupancy permit is in violation of Section 7.b of this

70

ordinance and shall, upon conviction thereof after notice and a hearing before the Magisterial District Judge, be sentenced to pay a fine of $1,000 for each additional Occupant permitted by Occupant that does not have an occupancy permit and $100 per additional Occupant per day for each day that Occupant continues to allow each such additional Occupant to occupy the Rental Unit without an occupancy permit after Occupant is given written notice of such violation by Owner or Agent or pursuant to Section 4 above.

SECTION 11. APPLICABILITY AND EXEMPTIONS TO THE ORDINANCE

The provisions of the ordinance shall not apply to the following properties, which are exempt from registration and license requirements:

a. Hotels, Motels and Dormitories.

b. Rental Units owned by Public Authorities as defined under the Pennsylvania Municipal Authorities Act, and Dwelling Units that are part of an elderly housing multi-unit building which is 75% occupied by individuals over the age of sixty-five.

c. Multi-dwelling units that operate under Internal Revenue Service Code Section 42 concerning entities that operate with an elderly component.

d. Properties which consist of a double home, half of which is let for occupancy and half of which is Owner-occupied as the Owner's residence.

SECTION 12. CONFIDENTIALITY OF INFORMATION

All registration information collected by the City under this Ordinance shall be maintained as confidential and shall not be disseminated or released to any individual, group or organization for any purpose except as provided herein or required by law. Information may be released only to authorized individuals when required during the course of an

official City, state or federal investigation or inquiry.

## SECTION 13. SAVINGS CLAUSE

This ordinance shall not affect violations of any other ordinance, code or regulation existing prior to the effective date thereof and any such violations shall be governed and shall continue to be punishable to the full extent of the law under the provisions of those ordinances, codes or regulations in effect at the time the violation was committed.

## SECTION 14. SEVERABILITY

If any section, clause, provision or portion of this Ordinance shall be held invalid or unconstitutional by any Court of competent jurisdiction, such decision shall not affect any other section, clause, provision or portion of this Ordinance so long as it remains legally enforceable without the invalid portion. The City reserves the right to amend this Ordinance or any portion thereof from time to time as it shall deem advisable in the best interest of the promotion of the purposes and intent of this Ordinance, and the effective administration thereof.

## SECTION 15. EFFECTIVE DATE

This Ordinance shall become effective immediately upon approval. This Ordinance repeals Ordinance number 2004-11 and replaces same in its entirety.

## SECTION 16.

This Ordinance is enacted by the Council of the City of Hazleton under the authority of the Act of Legislature, April 13, 1972, Act No. 62, known as the "Home Rule Charter and Optional Plans Law", and all other laws enforceable the State of Pennsylvania.